
NO.  2-05-456-CR

ALFREDO LEYVA PECINA                                                APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

## OPINION ON REMAND

------------

Appellant Alfredo Leyva Pecina was found guilty by a jury of murder and sentenced to life in prison.  Upon reconsideration on remand from the Texas Court of Criminal Appeals, we reverse and remand.

### I.  Procedural Background

Following his jury trial, Pecina appealed his conviction to this court and raised four issues, including complaints that the trial court erred by denying his motion to suppress statements he made to police in violation of his right to counsel under the Fifth and Sixth (and Fourteenth) Amendments.  This court affirmed the trial court's

judgment, and as relevant here, held that Pecina—after being warned of his *Miranda* rights[1] by a magistrate the police brought with them to question him in the hospital—either did not clearly invoke his right to counsel under the Fifth Amendment, or, alternatively, waived his right to counsel by reinitiating contact with the police.[2] We further held that, although Pecina's Sixth Amendment right to counsel attached when he was warned by the magistrate and requested counsel, Pecina reinitiated contact with the police and waived his right to have counsel present during the interrogation.[3]

The court of criminal appeals reversed this court, holding that Pecina had invoked his right to counsel and that the police reinitiated contact with Pecina; therefore, under the rule in *Michigan v. Jackson*,[4] Pecina's waiver of his Sixth Amendment right to counsel was invalid, and his statements given to the detectives should have been suppressed.[5]

---

[1] ... *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[2] ... *Pecina v. State*, No. 2-05-00456-CR, 2007 WL 1299263, at *8 (Tex. App.—Fort Worth May 3, 2007) (not designated for publication) ("*Pecina I*"), *rev'd*, 268 S.W.3d 564 (Tex. Crim. App. 2008) ("*Pecina II*").

[3] ... *Id.*

[4] ... 475 U.S. 625, 635, 106 S. Ct. 1404, 1410 (1986), *overruled by Montejo v. Louisiana*, 129 S.Ct. 2079, 2091 (2009).

[5] ... *Pecina II,* 268 S.W.3d at 569.

Although Pecina contended in his petition for discretionary review to the court of criminal appeals that any waiver of his right to counsel was also invalid under the Fifth Amendment, the court of criminal appeals did not reach or address Pecina's Fifth Amendment argument. The court remanded the cause to this court to conduct a harm analysis as to the violation of his Sixth Amendment right.[6]

## II. Scope of Review on Remand

After remand, the United States Supreme Court, in *Montejo v. Louisiana*,[7] overruled its decision in *Jackson*. Subsequently, the court of criminal appeals handed down an opinion in a case similar to this one, holding that "[a]fter *Montejo*, the Sixth Amendment does not bar police-initiated interrogation of an accused who has previously asserted his right to counsel."[8] Because of these intervening decisions, we will reconsider Pecina's contentions that his statements should have been suppressed under both the Fifth and Sixth Amendments.[9]

## III. Factual Background

---

[6] *Id.*

[7] 129 S. Ct. at 2085–92.

[8] *Hughen v. State*, 297 S.W.3d 330, 335 (Tex. Crim. App. 2009).

[9] *See Carroll v. State*, 101 S.W.3d 454, 456–59 (Tex. Crim. App. 2003) (holding that on remand a court of appeals may reconsider an issue and decide it on grounds not expressly contemplated by the court of criminal appeals's order); *Williams v. State*, 145 S.W.3d 737, 740 (Tex. App.—Fort Worth 2004, no pet.).

Pecina and his wife, Michelle, lived with Michelle's father and her sister, Gabriela. On the evening of January 30, 2004, Gabriela came home from work and found both Pecina and Michelle lying on the floor of their bedroom, bleeding from stab wounds. When she picked up the phone to call 911, Pecina stood up and came toward her. Gabriela ran from the apartment to borrow a phone. A neighbor called 911 and went with Gabriela back to the apartment. The neighbor saw blood all over the apartment. He told the 911 operator that a female lying on the bedroom floor appeared dead; a male who was also lying on the floor was still alive but appeared to be bleeding.

When paramedics and police arrived, they found an "extremely bloody" scene. Blood was on the walls and most of the furniture. Pools of blood were on the floor. A large amount of blood was around both victims. The female was cool to the touch with no pulse and multiple injuries to her upper torso and neck. Having determined that they could not resuscitate Michelle, the paramedics concentrated their attention on Pecina, who also had stab wounds, at least one of which appeared serious. Pecina moaned but was not able to talk. They placed Pecina on an IV for fluids and established an airway by intubating him. Pecina was then transported to Dallas Methodist Hospital.

Michelle was pronounced dead at the scene; it was later determined that she had been stabbed fifty-five times. A serrated kitchen knife, with a blade approximately seven inches in length, lay on the floor by the bathroom sink counter.

4

Officer Harris of the Arlington Police Department responded to the dispatch call and arrived at the scene within two minutes. She saw the knife on the floor and "secured" it until the crime scene investigators arrived.

Police found no evidence of forced entry or tampering with doors or windows. A crime scene investigator took blood samples from around the room and found a palm print on the bathroom mirror as well as latent prints near the front door handle. Another investigator went to the hospital the next day to document Pecina's stab wounds and to obtain fingerprints. He examined Pecina, who was still unconscious at that time. The investigator found no defensive wounds and found a number of small wounds that, in his opinion, appeared self-inflicted with many "hesitation" marks around the larger wounds. Because the police believed Pecina had murdered his wife and had attempted to kill himself, detectives prepared a warrant for his arrest. On the afternoon of February 5, 2004, Detective Nutt, the Arlington police officer in charge of the investigation, took a Spanish-speaking magistrate, Arlington Municipal Judge Maddock, and Detective Frias, who was also fluent in Spanish, with him to the hospital. According to the detectives, the purpose of taking the magistrate with them was to have Pecina arraigned before they interviewed him. Pecina was in a room, being guarded by a Dallas County deputy sheriff. The detectives entered Pecina's hospital room with the magistrate and introduced themselves to Pecina and the Dallas County deputy. The magistrate went to the left side of Pecina's hospital bed with the deputy on the right side. She pointed to the

officers and said, "They are here. They would like to speak to you." She testified that Pecina "nodded his head or said 'yes.' I can't remember, but there was an acknowledgment." She advised Pecina that he had been charged with murder. She then read Pecina his *Miranda* rights in Spanish, including the right to hire a lawyer or to have a lawyer appointed to represent him if he could not afford one, the right to have the lawyer present prior to and during any interview and questioning by peace officers, the right to remain silent, and the right to stop any interviewing or questioning at any time. Judge Maddock testified at the suppression hearing that following her reading of those warnings, she asked Pecina if he wanted a court-appointed lawyer, and he "said he did."[10]

The magistrate also explained to Pecina that, in the event he wanted an attorney appointed for him, he would be asked to complete a written form about his financial resources and provided with forms and assistance, if necessary, to complete the forms. She had Pecina sign the warnings form. The magistrate wrote on the bottom of the waiver of counsel form that she was requesting appointment of counsel on her own motion without requiring the forms. Without waiting for appointment of counsel, the magistrate then asked Pecina, "Do you still want to talk to the officers?" and he said, "Yes."

---

[10] The magistrate's verbal warnings and Pecina's responses were either not recorded or transcribed; we rely on testimony of the magistrate at the suppression hearing prior to trial as to what was said at that preliminary hearing.

6

The detectives waited in the hall while Judge Maddock administered the warnings; they re-entered the room when she advised them to come back in. As she handed the documents to the detectives, Judge Maddock advised them that Pecina had requested a lawyer, but told them that Pecina said he also wanted to talk to them. Detective Nutt recalled that Judge Maddock said Pecina had initially requested a lawyer but then told her that he wanted to talk to the detectives.

Detective Frias then read Pecina the *Miranda* warnings in Spanish a second and third time—once before they started recording the interview and again after turning on the recording device. At some point in the interview, Pecina signed a printed waiver of counsel form. At the conclusion of their interview, Detective Frias wrote out a statement in Spanish that Pecina signed, which included a waiver of the right to counsel. Detective Frias wrote in Spanish in the margin of the waiver of counsel form, "I asked for a lawyer, but I also wanted to speak with the Arlington police." The officers then transported Judge Maddock back to her office.

In his taped confession to the police, Pecina said that he did not remember much that happened that day, that he had not used drugs or alcohol, that he and his wife had argued about her not wanting to be with him, he became angry, and they began to fight. When asked if he had cut Michelle, he said, "[Y]es." Pecina said that no one else was present when these events occurred and that he had no memory of cutting himself. In Pecina's written statement, he stated that he picked up the

7

knife from the kitchen and cut his wife. He did not remember how many times he cut her.

Upon returning to her office, Judge Maddock faxed the forms for Pecina's request for counsel to the office of attorney appointments in Arlington for processing, as "we do not have at our disposal right there the court appointed attorneys to immediately come up and speak to them." Counsel was not appointed to represent Pecina until the next morning, February 6, 2004.

### IV. Motion to Suppress

Pecina filed a motion to suppress both his oral and written statements, claiming that the statements were not voluntarily given and were obtained in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. At the suppression hearing, in addition to the testimony related above, the State, on redirect examination of the magistrate, sought to confirm that Pecina indicated to her that he wanted to talk to the officers. She responded, "He said he still—I said, I asked them—him, 'do you still want to talk to them?' And he said, 'Yes.' He never said to me that he wanted to talk to them."

The trial court denied the motion to suppress and found that Pecina was fully informed of his rights and "indicated that although he did want a lawyer, that he wished to also talk with detectives from Arlington, meaning that he basically was waiving his rights at that time." The trial court further found that Pecina also signed various waivers of counsel and was not under the influence of drugs or alcohol when

8

he gave the statements that were recorded and put in writing. Based on those findings, the trial court concluded that the statements were taken "voluntarily" and were admissible. The jury found Pecina guilty of murder and sentenced him to life in prison.

## V. First Appeal

On Pecina's original appeal to this court, we addressed Pecina's issues regarding the right to counsel under both the Fifth and Sixth Amendments and held that the trial court did not err by finding that Pecina had voluntarily waived his rights.[11] We reasoned that Pecina had waived his Fifth Amendment right to counsel "either by failing to invoke it . . . or because he reinitiated the contact by answering 'yes' when asked" by the magistrate if he still wanted to speak with the detectives and by telling the detectives that he wanted to speak to them because nothing in the record clearly showed that Pecina had indicated to Judge Maddock or the detectives at the time of the interview that he wanted to speak to an attorney about the questioning or to have one present during the questioning.[12]

This court also concluded that Pecina's Sixth Amendment right to counsel had attached when he was administered his *Miranda* warnings by the magistrate and

---

[11] ... *Pecina I*, 2007 WL 1299263, at *7.

[12] ... *Id*. at *8.

9

requested a court-appointed attorney.[13] We further determined that Pecina invoked his Sixth Amendment right to counsel. But we determined that he then waived his Sixth Amendment right to counsel when he said, "I asked for a lawyer, but also I wanted to speak with the Arlington police."[14] We held that Pecina also waived his right to counsel when he was advised of his *Miranda* rights multiple times by the detectives prior to the interview, initialed the written warnings, and answered on the recording that he understood each right as it was read to him.[15] This court affirmed Pecina's conviction, deferring to the trial court's findings of fact and rejecting Pecina's arguments that his Fifth and Sixth Amendment rights were violated.[16]

The court of criminal appeals reversed this court's decision, holding that Pecina invoked his right to counsel when he was arraigned by the magistrate and that Pecina did *not* initiate contact with the police by answering "Yes" to Judge Maddock's subsequent question as to whether he still wanted to talk to police; rather, the police, acting through Judge Maddock, initiated the contact with Pecina.[17] The court thus held that, in violation of the Sixth Amendment and based on *Jackson*, the police, themselves, effectively initiated police interrogation "after [Pecina's]

---

[13] ... *Id.*

[14] ... *Id.*

[15] ... *Id.*

[16] ... *Id.*

[17] ... *Pecina II*, 268 S.W.3d at 569–70.

10

assertion, at an arraignment or similar proceeding, of his right to counsel[, and] any waiver of [Pecina's] right to counsel for that police-initiated interrogation [was] invalid."[18] The court of criminal appeals remanded the case to this court, instructing us to conduct a harm analysis.[19]

## VI. Discussion

### A. Pecina's Sixth Amendment Issue on Remand

The first question now facing this court is whether we are to conduct the harm analysis as instructed by the court of criminal appeals or re-evaluate Pecina's Sixth Amendment claim under *Montejo*. We have received supplemental briefing from the State and Pecina's counsel. The State argues that we should reconsider Pecina's Sixth Amendment claim on the merits and hold that, under *Montejo*, his rights were not violated when he freely and voluntarily gave his statement without counsel present, having been twice warned of his rights after invoking his right to counsel.

Pecina counters that, unlike the defendant in *Montejo,* who stood silent at his arraignment, Pecina affirmatively invoked his right to counsel before the police took his statement. Thus, Pecina argues any waiver by him is invalid even after *Montejo*, and this court should now proceed to conduct the harm analysis as instructed by the

---

[18] ... *Id.* (*quoting Jackson*, 475 U.S. at 636, 106 S. Ct. at 1404).

[19] ... *Id.* at 569.

11

court of criminal appeals, hold that there was harm, and remand this case to the trial court for a new trial.

### 1. *Jackson* no longer applies.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[20] The Sixth Amendment right to counsel is fundamental and essential to a fair trial and, therefore, applies to the States by virtue of the Fourteenth Amendment.[21] Once the adversarial process has been initiated, the Sixth Amendment right to counsel thereafter guarantees an accused the right to have counsel present at all "critical" stages of the prosecution.[22]

The warnings that the magistrate read to Pecina before his interrogation were those required to be administered by a magistrate by article 15.17 of the Texas Code of Criminal Procedure.[23] The arresting officer must take the person arrested before

---

[20] U.S. Const. amend. VI.

[21] *Gideon v. Wainwright,* 372 U.S. 335, 343–44, 83 S. Ct. 792, 795 (1963) (holding "fundamental nature" of right to counsel makes it obligatory on the States by the "due process" clause of the Fourteenth Amendment).

[22] *United States v. Wade*, 388 U.S. 218, 227–28, 87 S. Ct. 1926, 1932–33 (1967).

[23] Tex. Code Crim. Proc. art. 15.17 (a) (Vernon Supp. 2009) (placing duty on arresting officer and magistrate to administer warnings there listed). Article 15.17(a) also requires the magistrate to advise the person arrested that "he is not required to make a statement and that any statement made by him may be used against him." *Id.*

a magistrate "without unnecessary delay" but not later than forty-eight hours after his arrest to have those warnings given, probable cause for his arrest determined, and bail set.[24] If the person is indigent and requests appointment of counsel, the magistrate must appoint counsel, if empowered to do so by law, or forward the forms for appointment of counsel to the court within twenty-four hours of the request.[25]

An Article 15.17 warnings hearing, like a formal arraignment, has been held sufficient to mark the initiation of adversarial proceedings against an accused and to signal attachment of the Sixth Amendment right to counsel.[26] Efforts to elicit information from the accused after charges have been brought, including in-custody interrogations by police, are "critical stages" of a criminal proceeding.[27] In *Jackson*, the Supreme Court held that, if police initiate custodial interrogation after a defendant has asserted his right to counsel at an arraignment or similar proceeding,

---

[24] ... *Id.* (The record shows that the magistrate set bond at $1,000,000 in this instance, but there is no indication that the magistrate made a probable cause determination).

[25] ... *Id.*

[26] ... *Rothgery v. Gillespie County, Tex.*, 554 U. S 191, 128 S. Ct. 2578, 2591–92 (2008) (holding right to counsel "attaches" at an article 15.17 hearing, with the consequent obligation to appoint counsel); *see Brewer v. Williams*, 430 U.S. 387, 388–89, 97 S. Ct. 1232, 1239–40 (1977) (holding right to counsel attaches at the initial appearance of an accused before a judicial officer).

[27] ... *Brewer,* 430 U.S. at 388–89, 97 S. Ct. at 1239–40; *Massiah v. United States*, 377 U.S. 201, 204–05, 84 S. Ct. 1199, 1201–02 (1964).

13

any waiver of the defendant's Sixth Amendment right to counsel for that police-initiated interrogation is invalid.[28]

The court of criminal appeals's holding that Pecina's Sixth Amendment right to counsel was violated and its instruction to us to conduct a harm analysis were predicated squarely on *Jackson*; the court concluded that the police initiated interrogation after Pecina asserted his right to counsel at his article 15.17 hearing and, therefore, "waiver of [his] right to counsel for that police-initiated interrogation is invalid."[29] *Montejo*, however, changed the legal landscape regarding the effect of a defendant's waiver of the Sixth Amendment right to counsel after an arraignment or similar proceeding.[30] In *Montejo*, the Court overruled *Jackson,* in part based upon its reasoning that the right to counsel during custodial interrogation, whether the interrogation occurs before or after formal adversarial proceedings are initiated, is sufficiently protected by "three layers of prophylaxis" already provided by the *Miranda*, *Edwards*, and *Minnick* Fifth Amendment line of cases.[31]

### 2. *Miranda v. Arizona*

---

[28] ... 475 U.S. at 636, 106 S. Ct. at 1411.

[29] ... *Pecina II*, 268 S.W.3d at 568 (quoting *Jackson*, 475 U.S. at 636, 106 S. Ct. at 1411).

[30] ... *Montejo,* 129 S. Ct. at 2090.

[31] ... *Id*. at 2081 (citing *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 491 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880, 1884–85 (1981); *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630).

14

In *Miranda*, the Supreme Court held that the Fifth Amendment prohibition against compelled self-incrimination—that [n]o person . . . shall be compelled in any criminal case to be a witness against himself"—requires that a suspect subject to "custodial interrogation" has the right to remain silent; to further ensure that right is protected, he has the right to consult with counsel and to have counsel present during questioning, and the police must explain these rights to the accused prior to any questioning.[32] In the *Miranda* context, "custodial interrogation" means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.[33] Significantly, the Court in *Miranda* held that if the accused indicates he wishes to remain silent, "the interrogation must cease."[34] And if the accused requests counsel, "the interrogation *must cease until an attorney is present*."[35] *Miranda* thus declared that

---

[32] *... Miranda,* 384 U.S. at 479, 86 S. Ct. at 1630; *Edwards,* 451 U.S. at 482, 101 S. Ct. at 1883; *see Davis v. United States*, 512 U.S. 452, 457, 114 S. Ct. 2350, 2354 (1994) (reaffirming right to assistance of counsel under *Miranda* when accused is subject to "custodial interrogation*,"* which right must be explained to him before questioning begins); *see also Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492–93 (1964) (holding that the Fifth Amendment right against self-incrimination applies to the States through the Fourteenth Amendment).

[33] *... Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630; *see Davis*, 512 U.S. at 459, 114 S. Ct. 2350 (suspect must, at a minimum, make some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney").

[34] *... Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630.

[35] *... Id.* at 474, 86 S. Ct. at 1627 (emphasis added).

the accused has a Fifth (and Fourteenth) Amendment right to have counsel present during custodial interrogation.[36]

In *Miranda,* the Court further concluded that, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."[37]

### 3. Edwards v. Arizona

In *Edwards,* the Court determined that traditional standards of waiver are not sufficient to protect the *Miranda* rights, and that "additional safeguards" are necessary at a subsequent interrogation if an accused has previously requested counsel.[38] Accordingly, the Court reaffirmed *Miranda's* absolute statement that once the accused exercises his right to counsel, "the interrogation must cease until an attorney is present."[39] Confirming that it is inconsistent with *Miranda* for authorities

---

[36] *Id.* at 474, 86 S. Ct. at 1627, *see Edwards,* 451 U.S. at 482, 101 S. Ct. at 1883; *see also Dickerson v. United States,* 530 U.S. 428, 438, 120 S. Ct. 2326, 2332 (2000) (holding that the *Miranda* protections are "constitutionally required").

[37] *Miranda,* 384 U.S. at 475, 86 S. Ct. at 1628 (invoking "high standards" of proof for waiver of constitutional rights enunciated in *Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019 (1938) that waiver must be knowing, intelligent, and voluntary).

[38] 451 U.S. at 484, 101 S. Ct. at 1884–85.

[39] *Id.* at 486, 101 S. Ct. at 1885 (quoting *Miranda*, 384 U.S. at 474, 86 S. Ct. at 1627).

"at their instance," to interrogate an accused in custody if he has clearly asserted his right to counsel, and as a corollary to *Miranda*, the Court in *Edwards* established a rigid, "bright-line" rule that an accused in custody who has "expressed his desire to deal with the police through counsel is not subject to further interrogation until counsel has been made available to him unless the accused, himself, initiates further communications, exchanges, or conversations with the police."[40]  If the police nevertheless subsequently initiate an encounter in the absence of counsel, the suspect's statements are *presumed* involuntary and are inadmissible in evidence against him even if he executes a waiver and even if the waiver would be considered voluntary under traditional standards.[41]  The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda rights.*"[42] Thereafter, in *Minnick,* the Court held that the protection of a suspect's Fifth Amendment right to counsel by *Edwards* does not end for police-initiated

---

[40] *Id.* at 484–85, 101 S. Ct. at 1884–85; *see Solem v. Stumes,* 465 U.S. 638, 641, 104 S. Ct. 1338, 1340 (1984) (characterizing *Edwards* as establishing a bright-line rule and reaffirming that once a suspect has invoked the right to counsel, any subsequent interrogation must be initiated by him).

[41] *See Maryland v. Shatzer*, 130 S. Ct. 1213, 1221–22 (2010) (reaffirming *Edwards's* "conclusive presumption" of invalidity of waiver of Fifth Amendment right to counsel but holding presumption did not continue following break in custody of more than fourteen days after return of accused to general prison population); *Edwards,* 451 U.S. at 484–85, 101 S. Ct. at 1884–85 (waiver presumed involuntary if counsel not present unless accused, himself, reinitiates communication).

[42] *Davis,* 512 U.S. at 458, 114 S. Ct. at 2355 (citing *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180 (1990)).

interrogation merely because an accused has once consulted an attorney; the attorney must be present at the interrogation.[43]

However, an accused may still waive his right to counsel after he has invoked it. In *Oregon v. Bradshaw*, the Supreme Court clarified *Edwards* by establishing a two-step procedure to determine whether a suspect has waived his previously invoked Fifth Amendment right to counsel.[44] The first step requires proof, as mandated by *Edwards*, that the suspect himself initiated further communication with the officers after invoking his right to counsel; the second step requires proof that after the suspect reinitiated contact, he voluntarily, knowingly, and intelligently waived the right to counsel.[45] If this two-step waiver requirement is shown, the *Edwards* rule is fully satisfied.[46]

### 4. *Michigan v. Jackson*

In *Jackson*, the Court created a presumption that any waiver of the Sixth Amendment right to counsel is likewise invalid if police initiate interrogation once a defendant has invoked his right to counsel at an arraignment or formal preliminary hearing initiating criminal proceedings, analogizing to the similar prophylactic rule

---

[43] ... 498 U.S. at 156, 111 S. Ct. at 492.

[44] ... 462 U.S. 1039, 1044–46, 103 S. Ct. 2830, 2834–35 (1983); *see Cross v. State*, 144 S.W.3d 521, 526–27 (Tex. Crim. App. 2004).

[45] ... *Cross,* 144 S.W.3d at 527 (citing and following *Bradshaw*, 462 U.S. 1044–46, 103 S. Ct. at 2834–35).

[46] ... *Id.*

established in *Edwards* for protection of the Fifth Amendment-based *Miranda* right to have counsel present at any custodial interrogation.[47] Because doubts must be resolved in favor of protecting constitutional rights, the Court held in *Jackson*, citing *Edwards*, that in the Sixth Amendment context, any waiver under traditional voluntariness standards subsequent to the invocation of counsel would, as in *Edward*s, be likewise presumed insufficient to waive the right to counsel in the context of police-initiated interrogation.[48]

### 5. *Montejo v. Louisiana*

The right to counsel under the Fifth Amendment must be affirmatively invoked by the accused by a clear and unequivocal request for counsel prior to or during questioning.[49] The Sixth Amendment right attaches "automatically" at the initiation of adversary criminal proceedings.[50] Both of the defendants in the consolidated cases in *Jackson* had requested appointed counsel at preliminary hearings before being interrogated by police.[51] In *Montejo*, the defendant did not request counsel but stood mute at his preliminary hearing required by Louisiana law, at which the court

---

[47] ... 475 U.S. at 636, 106 S. Ct. at 1411.

[48] ... *Id.* at 635–36, 106 S. Ct. at 1410–11.

[49] ... *Davis,* 512 U.S. at 456–57, 114 S. Ct. at 2355–56; *Miranda*, 384 U.S. at 473–74, 86 S. Ct. at 1627.

[50] ... *Davis,* 512 U.S. at 456–57, 114 S. Ct. at 2355–56.

[51] ... *Jackson*, 475 U.S. at 626–28, 106 S. Ct. at 1406–07.

nevertheless ordered counsel appointed under its state procedural rules.[52] Three

hours later, and before Montejo could meet with counsel, detectives visited him in

prison and read him his *Miranda* rights, after which he accompanied them on an

excursion to locate the murder weapon and wrote an inculpatory letter of apology to

the victim.[53]        Montejo sought to suppress the letter of apology as evidence at

trial by extending *Jackson* to his situation—in which counsel had been appointed

even though not expressly requested.[54] The Louisiana Supreme Court held that an

actual request for counsel or other assertion of the Sixth Amendment was required

to trigger the *Jackson* rule presuming invalidity of any waiver of the Sixth

Amendment right to counsel.[55] The United States Supreme Court considered that

approach of limiting *Jackson* to cases in which the defendant actually requests

counsel at his first preliminary hearing, but the Court noted its unfairness in over half

of the states in which counsel is automatically appointed at preliminary hearings

such that defendants in those states have no opportunity to invoke the right to

counsel themselves.[56] But the Court also refused to extend *Jackson*'s presumption

---

[52] *See Montejo*, 129 S. Ct. at 2082.

[53] *id.*

[54] *Id.* at 2083–84.

[55] *See id.* at 2083.

[56] *Id.* at 2084.

to cases in which no request is made but counsel has been appointed or the defendant is otherwise represented.[57]

Refusing to accept either approach, the Court instead *sua sponte* re-evaluated *Jackson* and concluded that *Jackson*'s extension of the *Edwards* bright-line rule to the Sixth Amendment right to counsel is "unworkable."[58] Significantly, the Court based its decision, in large part, on its conclusion that the Sixth Amendment right to counsel is adequately protected by the existing guarantees of the Fifth Amendment by virtue of *Miranda* and *Edwards*, and because, under a cost-benefit analysis, the "substantial costs" of adding the exclusionary rule of *Jackson* on top of those in *Miranda* and *Edwards* far outweigh any "marginal benefits."[59] Accordingly, the *Montejo* Court held: "*Michigan v. Jackson* should be and now is overruled."[60]

### 6. *Hughen v. State*

After the court of criminal appeals remanded this case to us, and after the Supreme Court issued *Montejo*, the court of criminal appeals handed down its opinion in *Hughen*.[61] In *Hughen*, the court analyzed the effect of *Montejo* on a defendant's right to have counsel present during interrogation after the Sixth

---

[57] ... *Id.*

[58] ... *Id.* at 2082.

[59] ... *Id.* at 2091.

[60] ... *Id.*

[61] ... *See* 297 S.W.3d at 330.

Amendment right to counsel has attached under circumstances similar to this case.[62]

In *Hughen*, after the defendant was arrested and taken to the county jail, police took him before a magistrate pursuant to article 15.17.[63] The magistrate explained the charges and informed him of his *Miranda* rights.[64] Hughen acknowledged that he understood his rights and asked that counsel be appointed to represent him.[65] Three hours later, without waiting for the appointment of Hughen's counsel, officers took Hughen from his jail cell and placed him in an interview room.[66] One of the officers explained to Hughen his *Miranda* rights again, and then asked three questions:

> (1) "Do you understand your rights, [Hughen]?" Hughen nodded in the affirmative. (2) "And understanding these rights, do you need to have a lawyer present before any questioning?" He answered, "I guess not right now, no." (3) "Having these rights in mind, will you talk to me now?" Hughen answered, "Okay."[67]

Before signing the waiver form, Hughen asked the officers, "This ain't waiving my right for an attorney, is it?"[68] An officer responded, "No, sir. This is just talking with

---

[62] ... *Id.* at 334–35.

[63] ... *Id.* at 331.

[64] ... *Id.*

[65] ... *Id.* at 331–32.

[66] ... *Id.*

[67] ... *Id.* at 332.

[68] ... *Id.*

us about what happened and what was going on and all that good stuff."[69] Hughen

then signed a waiver, and the officers interrogated Hughen immediately after he

signed.[70] The court of criminal appeals held that Hughen could no longer rely upon

*Jackson*, since it has been overruled by *Montejo*, that the Sixth Amendment thus

does not bar police-initiated interrogation after an accused has previously asserted

his right to counsel, that Hughen's subsequent waiver of counsel was valid, and that

Hughen's statement to police was properly admissible against him at trial.[71]

   *Hughen* is analogous to this case with respect to Pecina's Sixth Amendment

right to counsel.  Officers brought the magistrate to the hospital to administer

warnings to Pecina pursuant to Article 15.17 of the Texas Code of Criminal

Procedure.  The magistrate read him his rights in Spanish and asked him if he

wanted a court-appointed attorney.  He said that he did.  But without waiting for the

appointment of counsel, the magistrate then asked Pecina if he wanted to speak to

the detectives, and he said, "Yes."  Before speaking with the officers, Pecina signed

the "Adult Warning Form," which informed him that he had the right to counsel and

the right to remain silent, that he did not have to speak to the police, that he was not

required to make a statement, and that he had the right to stop any interview or

questioning at any time.  The officers then read Pecina the *Miranda* warnings twice

---

[69] ... *Id.*

[70] ... *Id.*

[71] ... *Id.* at 335.

23

more in Spanish, once before they started recording the interview and again after turning on the recording device, and Pecina signed a waiver of counsel.

Like the defendant in *Hughen*, Pecina can no longer rely on *Jackson*'s rule that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."[72] Thus, we come to the same issue addressed by our original decision: whether Pecina's statements to the detectives in the hospital were made after a voluntary, knowing, and intelligent waiver of his Sixth Amendment right to counsel.[73]

## B. Sixth Amendment Right to Counsel

After *Montejo*, under the Sixth Amendment, police may reinitiate a custodial interrogation after a defendant's right to counsel has attached and been invoked by him; the Sixth Amendment right to counsel is no longer presumed invalid in that circumstance but may be waived, so long as relinquishment of the right is voluntarily, knowingly, and intelligently given.[74] As held by the majority in *Montejo*, the defendant may now waive the Sixth Amendment right whether or not he is already

---

[72] *... Jackson,* 475 U.S. at 636, 106 S. Ct. at 1411.

[73] *... See Pecina I*, 2007 WL 1299263, at *7.

[74] *... See Patterson v. Illinois*, 487 U.S. 285, 292 n.4, 108 S. Ct. 2389, 2393 n.4 (1988); *Brewer*, 430 U.S. at 404, 97 S. Ct. at 1236 (same); *Johnson*, 304 U.S. at 464, 58 S. Ct. at 1022 (same).

24

represented by counsel; the decision to waive need not itself be counseled.[75]  And

when a defendant is read his *Miranda* rights (which include the right to have counsel

present during interrogation) and agrees to waive those Fifth Amendment rights, that

usually "does the trick" to also waive the Sixth Amendment right to counsel, even

though the *Miranda* rights do not refer to the Sixth Amendment right to counsel and

have their source in the Fifth Amendment.[76]

Giving due deference to the trial court's findings of fact, we note that the trial

court's finding that Pecina requested to have the detectives speak to him is incorrect

because it is contrary to the undisputed record.  We also note that the trial court's

conclusion that the statement was "voluntary" is not sufficient to establish waiver of

Pecina's Sixth Amendment right to counsel.  The waiver must be "knowing and

intelligent" as well as voluntary.[77]  However, we need not determine the issue of

waiver of Pecina's Sixth Amendment right to counsel because, even if we held that

---

[75] *Montejo,* 129 S. Ct. at 208 (citing *Harvey*, 494 U.S. at 352–53, 110 S. Ct. at 1180).

[76] *Id.*, 129 S. Ct. at 2085; *see also Patterson*, 487 U.S. at 296, 108 S. Ct. at 2397 ("As a general matter . . . an accused who is admonished with the warnings prescribed . . . in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.").

[77] *Patterson*, 487 U.S. at 292, 108 S. Ct. at 2394 (finding "knowing and intelligent" and voluntary waiver of defendant's Sixth Amendment right to counsel at post-indictment questioning valid where defendant was given his *Miranda* warnings and informed of the benefits of what counsel could do for him and the consequences of a decision to waive his rights, without claiming his right to silence or to counsel, and executed a written waiver).

25

waiver of the Sixth Amendment right was established, we are still faced with the issue of Pecina's Fifth Amendment right to counsel, which is, as addressed below, dispositive.

### C. Fifth Amendment Right to Counsel

In overruling *Jackson*, the majority in *Montejo* reasoned that *Jackson's* purpose was being adequately served by other means, namely, the protection provided by the "*Miranda - Edwards - Minnick* line of cases," which the Court said, "is not in doubt," and under which a defendant in custody who does not want to speak to the police without counsel "need only say as much when he is first approached and given the *Miranda* warnings."[78]  At that point, the Court said, not only must the immediate contact end,

> but "badgering" by later requests is prohibited.  If that regime suffices to protect the integrity of "a suspect's voluntary choice not to speak outside his lawyer's presence" before his arraignment, [] *it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached.  And if so, then Jackson is simply superfluous.*[79]

In other words, the Court explained, although *Miranda* and *Edwards* protect the Fifth Amendment, not Sixth Amendment, rights, "that is irrelevant.  What matters is that these cases, like *Jackson*, protect the right to have counsel during custodial

---

[78] ... *Montejo*, 129 S. Ct. at 2090.

[79] ... *Id.* (emphasis added) (citing *Texas v. Cobb*, 532 U.S. 162, 175, 121 S. Ct. 1335, 1344 (2001) (Kennedy, J., concurring)).

26

interrogation—which right happens to be guaranteed (once the adversary process has begun) by two sources of law."[80]  Assuming the defendant is in custody, "the doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver."[81]  Concluding, the Court reiterated that its overruling of *Jackson* was based "in part on the protections already provided by *Edwards*."[82]

Subsequently, in *Hughen*, the court of criminal appeals observed that, after *Montejo*, while the Sixth Amendment does not bar police-initiated interrogation of an accused who has previously asserted his right to counsel, "the Fifth Amendment does bar police-initiated interrogation of an accused who, in the context of custodial interrogation, has previously asserted his right to counsel unless the accused's counsel is actually present."[83]  Because Hughen had raised only the issue of his Sixth Amendment right to counsel in the court of criminal appeals, not his Fifth Amendment right, the court of criminal appeals noted in its opinion in *Hughen* that it did not grant review to consider that complaint.[84]

---

[80] ... *Id.*

[81] ... *Id.*

[82] ... *Id.*

[83] ... 297 S.W.3d at 335 (citing *Minnick*, 498 U.S. at 153, 111 S. Ct. at 491 and *Edwards,* 451 U.S. at 484–85, 101 S. Ct. at 1885).

[84] ... *Id.* at 334 n.3.

In contrast, Pecina did raise his Fifth Amendment right to counsel in the trial court, in this court, and in his petition for discretionary review. The court of criminal appeals did not reach the Fifth Amendment issue in this case, not because Pecina failed to raise it, but because it granted relief to Pecina on his Sixth Amendment issue, reversing this court's decision based on Pecina's Sixth Amendment right under *Jackson*.

While *Jackson* no longer stands, the underlying basis for the court of criminal appeals's reversal does. In reversing this court's decision that Pecina, himself, reinitiated contact with the police, the court of criminal appeals stated, "[A]nswering 'yes' when asked if he wanted to speak to detectives does not indicate that [Pecina] initiated the contact . . . ."[85] To the contrary, the court said, "[i]n no way does this indicate that [Pecina] himself initiated contact or opened the dialog with the authorities."[86] Thus, the court held, "there was no initiation of contact with the police by [Pecina]. Just as in *Edwards,* the State showed only that [Pecina] responded to further police-initiated questioning."[87] These holdings by the court of criminal appeals, while addressing Pecina's Sixth Amendment right to counsel, rely on *Edwards*, a Fifth Amendment case. The same holdings apply to the same facts in the context of the Fifth Amendment, as confirmed by the Supreme Court in

---

[85] *Pecina II*, 268 S.W.3d at 568.

[86] *Id.*

[87] *Id.*

28

*Montejo.*[88]  Thus, they apply equally to Pecina's complaint that he was denied his

Fifth Amendment right to counsel and compel us to re-examine our holding on that

issue.[89]  That is, the court of criminal appeals's holding that Pecina did not initiate

contact with the police by answering "yes" to Judge Maddock's question is controlling

in a Fifth Amendment analysis as well as in the Sixth Amendment context.

The *Miranda-Edwards-Minnick* Fifth Amendment regime was not abolished or

modified, nor was it in any other way affected by *Montejo.*  The Court in *Montejo*

assures us that the *Miranda-Edwards-Minnick* regime is "not in doubt."[90]  *Miranda*

and *Edwards* are still the law for suspects in custody subjected to police

interrogation, regardless of the overruling of *Jackson*, which had merely added

another protective layer for protection via the Sixth Amendment right.  To protect the

Fifth Amendment privilege against self-incrimination, the police still may not initiate

custodial interrogation of a suspect who has previously requested assistance of

---

[88] ... "The 'law of the case' doctrine is as applicable to the appeals of criminal cases as it is to appeals of civil cases."  *Ware v. State,* 736 S.W.2d 700, 701 (Tex. Crim. App. 1987).  "The legal principle or doctrine of 'the law of the case' in its most basic form provides that an appellate court's resolution of a question of law in a previous appeal of the same case will govern the disposition of the same issue should there be another appeal."  *Id.*

[89] ... *See Carroll,* 101 S.W.3d at 460 ("If the court of appeals has authority to decide a particular point of error on a different, but appropriate, legal basis despite a narrow remand order, *a fortiori*, it should not be precluded from reconsidering the original legal basis for its decision."); *Williams,* 145 S.W.3d at 740 (re-examining issue not addressed by court of criminal appeals on remand for harm analysis as to different issue).

[90] ... 129 S. Ct. at 2090.

counsel. "Once a suspect has invoked the right of counsel during questioning by police, the Fifth Amendment right to counsel has been invoked and *all interrogation by the police must cease until counsel is provided or the suspect reinitiates conversation.*"[91] The *Miranda-Edwards-Minnick* rule "does not take into account the good intentions of the individual police officer, the lack of official coercion or badgering in the particular case, or the actual voluntariness of a person's custodial statement."[92] *Edwards* still "represents a bright and firm constitutional rule."[93] When Pecina requested appointment of counsel, which is undisputed, he invoked his Fifth Amendment right to consult with and have counsel present, as the magistrate explained that right to him, at any police questioning. The police were waiting in the hall to question him at that moment.

The dissent astonishingly asserts that what occurred in this case was somehow only a "noninterrogative interaction" between Pecina and the State, as to which the *Miranda-Edwards* line of cases is not invoked. Dissenting op. at 1. If there was no interrogation, where did the confessions by Pecina come from? Not only does this assertion ignore the record but, if the dissent is referring to the article

---

[91] *McCarthy v. State*, 65 S.W.3d 47, 51 (Tex. Crim. App. 2001) (emphasis added) (citing *Edwards*, 451 U.S. at 484–85, 101 S. Ct. at 1880; *Miranda,* 384 U.S. at 474, 86 S. Ct. at 1602; *Dinkins v. State*, 894 S.W.2d 330, 350–51 (Tex. Crim. App. 1995)).

[92] *Id.* at 52.

[93] *Id.*

15.17 hearing, it ignores the very purpose of such a procedure, which is required under Texas law to advise a suspect who has been arrested of his Fifth Amendment rights, including his right to counsel and, if indigent, to appointment of counsel under *Miranda*.[94] As pointed out in a similar case, an article 15.17 proceeding "is an *integral stage* in a defendant's invocation of the Fifth Amendment right to counsel to protect him against self-incrimination."[95]

Moreover, in further answer to the dissent, we are not "re-import[ing] *Miranda-Edwards* protections" into the Sixth Amendment by our holding that the admission into evidence of Pecina's statements violated the Fifth Amendment, for the simple

---

[94] Tex. Code Crim. Proc. art. 15.17(a); *see Hughen,* 297 S.W.3d at 331 (noting defendant received article 15.17 warnings consistent with *Miranda*). The dissent's argument would turn the intent of the legislature in requiring an article 15.17 hearing—to protect an accused's *Miranda* rights— upside down, making it impossible for a suspect to invoke those very rights of which he has just been advised. *See* Tex. Code Crim. Proc. art. 38.22(2) and (3) (Vernon 2002); *Oursbourn v. State*, 259 S.W.3d 159, 171–72 (Tex. Crim. App. 2008) (custodial interrogation statement not admissible unless, prior to making statement, accused received warnings provided in article 15.17 as required by article 38.22, sec. 2(a) or 3(a) (incorporating the requirements of *Miranda*)); *Garcia v. State,* 919 S.W.2d 370, 406–07 (Tex. Crim. App. 1994) (tracing history of amendments in response to *Miranda* to section 2 of article 38.22, which requires the article 15.17 warnings to be given by a magistrate or the person taking a statement for it to be admissible in evidence).

[95] *Higginbotham v. State*, 769 S.W.2d 265, 269 (Tex. App.—Houston [14th Dist.] 1989) (emphasis added), *rev'd on other grounds*, 807 S.W.2d 732 (Tex. Crim. App. 1991) (holding defendant invoked his Fifth Amendment right to counsel when he said, "I would like an attorney but I cannot afford one" in magistrate's article 15.17 hearing held after he was taken into custody; magistrate told him he would get an attorney in twenty-four hours; but officers violated defendant's Fifth Amendment right by then taking defendant back to interview room and proceeding to interrogate him after asking him if he still wanted to talk to them).

31

reason that we are applying those protections to this defendant's rights under the Fifth Amendment, not under the Sixth. *See* Dissenting op. at 2. In response to the dissent's insinuation that *Montejo* held that a defendant cannot invoke his right to counsel at a preliminary hearing under the Fifth Amendment, *Montejo* made no such holding.[96] *See* Dissenting op. at 1–2. In *Montejo,* the accused stood silent; he did not request counsel at his preliminary hearing.[97] The sole issue was waiver of Montejo's Sixth Amendment right to counsel.[98] *Montejo* did not involve the Fifth Amendment right to counsel. And, as previously noted, *Montejo* reaffirms that the *Miranda-Edwards* line of cases still applies to preserve the Fifth Amendment privilege against self-incrimination and a defendant's correlative right to counsel to protect that right.[99] As explained above, it is partly because of the overlapping protections afforded for the Fifth Amendment right to counsel that *Montejo* overruled *Jackson.*[100]

We also disagree with the dissent's assertion that whatever occurred at the article 15.17 hearing did not implicate *Edwards* because Pecina had somehow "not yet been approached for interrogation." Dissenting op. at 4. The record belies any

---

[96] *See* 129 S. Ct. at 2082–92.

[97] *Id.* at 2082, 2086–87.

[98] *Id.* at 2085–91.

[99] *Id.* at 2085–86.

[100] *Id.* at 2090.

such interpretation.[101] The detectives did not just happen to show up at Pecina's hospital room. They went to the hospital to arrest Pecina and to interrogate him and brought with them the magistrate to administer his *Miranda* warnings; they walked into his room with the magistrate; the magistrate explained to Pecina that the detectives wanted to talk to him; and they waited in the hall while she administered the warnings. After he had invoked his right to counsel, they proceeded to re-enter the room and conduct their interrogation after reading Pecina his *Miranda* rights a second and third time. As the court of criminal appeals held, the magistrate was acting on behalf of the officers in initiating the interrogation.[102] The detectives—acting through the magistrate—initiated interrogation by asking Pecina if he still wanted to talk to them.[103]

---

[101] Nor did Pecina invoke his Fifth Amendment right to counsel "anticipatorily," as the dissent asserts, using a term referenced in dictum by the majority opinion in *Montejo. See Montejo,* 129 S. Ct. at 2091; *see also McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3, 111 S. Ct. 2204, 2211 n.3 (1991) (stating "we have in fact never held that a person can invoke his *Miranda* rights anticipatorily"). Pecina asked for appointed counsel in response to being advised that he was entitled to counsel during any questioning and while the police waited to do just that. His request was precisely for the sort of assistance of counsel that is the subject of *Miranda. See Montejo,* 129 S. Ct. at 2091 (stating "what matters for *Miranda* and *Edwards* is what happens when the defendant *is approached for interrogation*" (emphasis added)); *Miranda,* 384 U.S. at 470, 86 S. Ct. at 1626 (stating "a *pre-interrogation request* for a lawyer . . . affirmatively secures [the] right to have [counsel]" (emphasis added)).

[102] *Pecina II,* 268 S.W.3d at 568 n.1.

[103] Nor does Pecina's response that he still wanted to talk to the detectives after requesting counsel create an ambiguity in Pecina's invocation of counsel. There is nothing inconsistent about requesting counsel and agreeing to talk to the

33

The dissent complains that, if our interpretations of the *Montejo* and *Hughen* opinions are correct, the police will need to "cross their fingers" that a defendant only raises a complaint of the Sixth Amendment and not the Fifth Amendment regarding validity of a statement after invocation of counsel as in this case. Dissenting op. at 6. But if the dissent's arguments are correct, the police need only take a magistrate with them to conduct any custodial interrogation and "cross their fingers" behind their backs while letting the magistrate first administer the *Miranda* warnings, and then they may ignore with impunity any attempt by the defendant to request appointment of counsel from the magistrate, making a mockery of *Miranda*.

Finally, the dissent urges that Pecina's confession must be admissible because he is guilty of the crime. Dissenting op. at 11–12. The short answer to that amazing argument is that, in this country's justice system based on the rule of law, the test for whether a confession is admissible is not based on a subjective belief by judges that the defendant is guilty.

Because Pecina did not initiate the questioning by the police after asserting his right to counsel (as held by the court of criminal appeals in reversing this court's

---

authorities once counsel has been appointed. Moreover, an accused's expression of willingness to talk to police may not be used to create doubt retrospectively as to his initial request for counsel. *Smith v. Illinois*, 469 U.S. 91, 93, 96–97, 105 S. Ct. 490, 492–93 (1984) (an accused's post-request responses to further interrogation may not be used retrospectively to cast doubt on his initial request for counsel); *see State v. Martinez*, No. 08-08-00098-CR, 2010 WL 705930, at *8 (Tex. App.—El Paso, Mar. 2, 2010, no pet. h.) (not designated for publication) (holding agreement to make recorded statement, when accused had not initiated the continued discussion, did not undermine his previous invocation of right to counsel).

prior decision) and the police moved forward with more *Miranda* warnings and then their interrogation, any subsequent waiver of Pecina's right to counsel is presumed invalid, and we do not proceed to the second step under *Bradshaw* of determining whether his subsequent waiver was made voluntarily, knowingly and intelligently.[104] Because "waiver" of his right to counsel based upon the Fifth Amendment must be presumed invalid under *Edwards*,[105] the trial court abused its discretion in admitting Pecina's statements taken thereafter in violation of the Fifth Amendment.

### D. Harm Analysis

A trial court's erroneous admission of a defendant's statement in violation of the Fifth Amendment is federal constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(a).[106] Where the record reveals constitutional error, reversal is required unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment.[107] Error in admitting a defendant's statement is not harmless beyond a reasonable doubt if

---

[104] To a suspect who has requested counsel in the context of the pressures of custodial interrogation, further examination "will surely exacerbate whatever compulsion to speak the suspect may have been feeling;" "fresh sets" of *Miranda* warnings given over and over when counsel has not been provided do nothing to reassure a suspect who continues to be denied the counsel he clearly requested. *Arizona v. Roberson,* 486 U.S. 675, 686, 108 S. Ct. 2093, 2100 (1988).

[105] 451 U.S. at 484–85, 101 S. Ct. at 1884–85.

[106] Tex. R. App. P. 44.2(a); *see Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003); *McCarthy,* 65 S.W.3d at 55.

[107] Tex. R. App. P. 44.2(a); *McCarthy,* 65 S.W.3d at 55.

there is a reasonable likelihood that the error materially affected the jury's deliberations.[108] We should "calculate, as nearly as practicable, the probable impact of the error on the jury in light of the other evidence."[109] However, and despite the dissent's cry that Pecina is a "guilty and possibly dangerous criminal," whether admission of an inculpatory statement by a defendant was harmful is not determined solely on the basis of whether there was sufficient evidence, independent of the defendant's statement, to support the verdict.[110] The applicable harmless error analysis asks whether admission of the statement contributed to the verdict—regardless of whether there is independent evidence sufficient to sustain the verdict of guilt.[111]

A defendant's statement implicating himself in the commission of the offense is unlike any other evidence that can be admitted against the defendant.[112] "A defendant's confession is probably the most damaging evidence that can be admitted against him. . . . Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if

---

[108] *... Jones*, 119 S.W.3d at 777 (citing *McCarthy*, 65 S.W.3d at 55).

[109] *... McCarthy,* 65 S.W.3d at 55.

[110] *... Id.* (citing *Satterwhite v. Texas*, 486 U.S. 249, 258–59, 108 S. Ct. 1792, 1798 (1988)).

[111] *... Id.*

[112] *... Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 1257 (1991)).

told to do so."[113] Moreover, "[i]f the jury believes that a defendant has admitted the crime, it will doubtless be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case."[114] Mindful of these admonitions, we do not focus on the propriety of the outcome but on the integrity of the process that led to conviction and punishment.[115]

The theory of the defense was that the State failed to prove its case beyond a reasonable doubt because the palm print on the knife was not that of Pecina, and DNA from a third contributor was on the mirror. The defense argued that a third person may have been the perpetrator and attacked both Pecina and his wife from behind and that the prosecution's investigation was inadequate and incomplete in failing to obtain sufficient DNA samples from the room and the knife to prove Pecina's guilt. There were no eye-witnesses. Pecina and his wife were last seen some four hours before her sister, Gabriela, discovered the bloody scene in the bedroom.

The State agrees that its case was circumstantial but argues that it was a "very strong circumstantial evidence case" even without Pecina's statements. Gabriela's testimony was conflicting as to whether the front door was locked when

---

[113] ... *Fulminante,* 499 U.S. at 296, 111 S. Ct. at 1257 (quoting *Bruton v. United States*, 391 U.S. 123, 139–40, 88 S. Ct. 1620, 1630 (1968) (White, J., dissenting)).

[114] ... *Id.* at 313, 111 S. Ct. at 1266 (Kennedy, J., concurring).

[115] ... *Harris v. State,* 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).

she arrived. The State argues that the defense produced no evidence that anyone entered or left the apartment during that four-hour period; but it was not the defense's burden to do so.

The neighbor who called 911 said that Pecina opened his eyes, which the neighbor thought seemed threatening. Gabriela testified that Pecina stood up and came at her with his hands, which she thought was "like angry," before he fell. But it was undisputed that both the deceased and Pecina had suffered serious stab wounds and that Pecina required life-saving measures. The medical examiner testified that Pecina appeared to have both cuts and stab wounds that could be consistent with having been attacked from behind. And, although the crime scene investigator who inspected Pecina's wounds shortly after the occurrence believed some to have been "hesitation" cuts consistent with someone injuring himself, he admitted that he had no way of knowing if the wounds suffered by Pecina were self-inflicted.

The latent palm print on the mirror matched that of Pecina, but he lived at the apartment and was bleeding from his own injuries. The knife used in the stabbing was from the apartment's kitchen. But the crime scene investigator testified that the latent palm print in blood found on the knife, which he had only compared with Pecina's palm print the week before trial, was not a "match" for Pecina or anyone else who was known to have been present that evening. Samples of blood collected from the bedroom revealed DNA of a third contributor, and the senior DNA analyst

38

in the medical examiner's office testified that the medical examiner's office was never asked to exclude specific individuals as the source. No DNA sample was taken from the mirror, and the knife was never tested for DNA.

The defense called as its expert witness Dr. Robert Benjamin, a molecular biologist specializing for over forty years in genetics and DNA, who was recognized as such by the expert for the prosecution and who had often been consulted by law enforcement and district attorneys' offices. Dr. Benjamin was critical of the lack of completeness and lack of documentation of the DNA samples collected from the scene, particularly in light of two samples that came from another contributor, which he found significant; and he opined that the fact that no sample was taken from the murder weapon was surprising as well as significant. He characterized the lack of a "match" with Pecina for the palm print from the knife as a red flag that would have called for more testing.

The State's theory, supported by the testimony of the neighbor, the neighbor's daughter, and the deceased's sister, Gabriela, was that the deceased, who had previously come to the United States to work with her father and sister, was unhappy that Pecina had come from Mexico to join her; she wanted a divorce but he did not. She had planned to attend a concert that night with Gabriela and Pecina after they got off work. The State argued that Pecina's anger at his wife when she arrived home escalated in the apartment and led to the stabbing.

39

We agree with the State that ample circumstantial evidence supported its theory. Nevertheless, in the presentation of its case to establish Pecina's guilt, the State relied extensively on Pecina's statements taken from him at the hospital to show: that there was no third person present at the scene when the stabbing occurred, that Pecina was consumed with anger that the deceased did not want him, and that he used the knife to cut her. The State showcased Pecina's statements by presenting, in full, the testimony of the magistrate and the two investigators who took Pecina's recorded and written statements. The testimony of those three witnesses regarding the magistrate's conducting of the bedside warnings and the following interrogation, coupled with the reading of both Pecina's written statement and a transcript of his recorded statement to the jury, consume some sixty-five pages of the three-volume record of the testimony.

In closing argument in rebuttal, the State repeatedly focused the jury's attention on Pecina's statements as being all the jury needed to consider, and as rendering any gaps in its circumstantial evidence immaterial. The State argues on remand that the confession merely "confirmed" independent evidence that the jury already had. But at trial, the State argued the converse, that all of its other evidence merely corroborated the confession, stating,

> *The piece of evidence that you should be looking at* that the Defendant has conveniently not talked about a whole lot, *is the confession. Why should we be worried about the DNA when . . . the Defendant has confessed to killing his wife.* And is this an incomplete investigation? There's over 70 pieces of evidence here in front of you.

40

Ladies and gentlemen, if you want to know the straight scoop, *if you want to know what really happened, the best way to do it is to get it straight from the horse's mouth.*

*From the Defendant's mouth* we heard this. They were arguing that she was unhappy with him and did not want to be with him anymore. That she had told him that she was going out dancing without him that night and that he became irate. He became angry. He got a knife. He started struggling with the victim. And when he was asked point blank by Detective Danny Nutt and David Frias, did you cut Michelle with a knife, the answer was, yes, he did.

There's no third party here, ladies and gentlemen. *They even asked him point blank, was there anybody else present in the room during the time of this offense? He said no.* If there was a chance that he could have [been] snuck up from behind . . . why didn't he tell that to the detectives? He had his chance. It's a red herring. It's a Defense tactic to keep you from looking at the confession that there might have been someone else in the apartment. . . . Anything is possible on TV, but this is reality. And that is not a reasonable doubt, and that is the burden here. The evidence is overwhelming. . . . *He even admits to you that he did it.*

. . . [W]e know he's telling the truth, that he wasn't coerced into giving that statement. You've heard from the testimony of the judge who magistrated him that he was not coerced and that he was cooperative. . . . [Emphasis added].

The State used Pecina's statements as the only direct evidence the jury needed of his guilt and motive as well as to negate any shred of the defense's arguments that the State might not have carried its burden. The dissent even claims that Pecina's statements are essential for his conviction and that, without them, his crime will go unpunished. These arguments only strengthen our conclusion — it is impossible to say there is no "reasonable possibility" that the erroneously admitted

statements could have contributed to Pecina's conviction.  We therefore cannot with confidence conclude that admission of his statements was harmless beyond a reasonable doubt.

## VII.  Conclusion

We sustain Pecina's first point as to the violation of his Fifth Amendment rights.  We reverse the judgment of the trial court and remand this cause to that court for a new trial.


ANNE GARDNER
JUSTICE

PANEL:  GARDNER and WALKER, JJ.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

HOLMAN, J., filed a dissenting opinion.

PUBLISH

DELIVERED:  July 15, 2010



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-05-456-CR

ALFREDO LEYVA PECINA                                        APPELLANT

V.

THE STATE OF TEXAS                                               STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

## DISSENTING OPINION ON REMAND

------------

Because the United States Supreme Court's decision in *Montejo* and the court of criminal appeals' decision in *Hughen* stand for the proposition that the *"Miranda-Edwards* regime" does not apply to "noninterrogative types of interaction between the defendant and the State," and because that is the type of interaction that I believe occurred in this case, I respectfully dissent from the majority's holding that Pecina invoked his Fifth Amendment rights when he requested the appointment of counsel while being arraigned. *See Montejo v. Louisiana*, 129 S. Ct. 2079, 2091 (2009) (reasoning that the *Miranda-Edwards* line of cases is not necessarily invoked

during a preliminary hearing); *Hughen v. State*, 297 S.W.3d 330, 335 (Tex. Crim. App. 2010) (reasoning that the Fifth Amendment bar on police-initiated interrogation is applicable only "in the context of custodial interrogation"). But more than that, the majority's holding today basically re-imports *Miranda-Edwards* protections into an "arraignment or similar proceeding," effectively reviving *Jackson*—a holding that I disagree with and feel obliged to address. *See Michigan v. Jackson*, 475 U.S. 625, 635, 106 S. Ct. 1404, 1411 (1986) (holding that if police initiate interrogation after defendant's assertion, at arraignment or similar proceeding, of his right to counsel, any waiver of defendant's right to counsel for that police-initiated interrogation is invalid), *overruled by Montejo*, 129 S. Ct. at 2091.

It is apparent to me that *Montejo* and *Hughen* changed the legal landscape concerning what police are free to do *after* a defendant is appointed counsel at an arraignment or similar proceeding. *Montejo*, 129 S. Ct. at 2091; *Hughen*, 297 S.W.3d at 335. Under *Jackson*, once a defendant's Sixth Amendment rights had attached during an arraignment, police were forbidden from initiating interrogation. *Jackson*, 475 U.S. at 635, 106 S. Ct. at 1411. This is so because *Jackson* represented a "wholesale importation of the *Edwards* rule into the Sixth Amendment." *Montejo*, 129 S. Ct. at 2086 (citing *Texas v. Cobb*, 532 U.S. 162, 175, 121 S. Ct. 1335, 1342 (2001)). Under *Edwards*, once a defendant invokes his right to have counsel present during custodial interrogation, valid waiver of that right cannot be established by showing only that he responded to police-initiated interrogation after being again advised of his rights. *Edwards*, 451 U.S. at 485, 101

41

S. Ct. at 1885. As the majority points out, *Edwards* is still in full effect. But after *Montejo*, the *Miranda-Edwards* regime of cases does not apply in the context of an arraignment or preliminary hearing any longer. *Montejo*, 129 S. Ct. at 2091. The *Montejo* court specifically expressed that "[w]hat matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—*not what happened at any preliminary hearing.*" *Id*. (emphasis added). Thus, now that the *Montejo* court has overruled *Jackson*, neither a defendant's request for counsel at arraignment or similar proceeding nor appointment of counsel by a court gives rise to a presumption that any subsequent waiver by a defendant to police-initiated interrogation is invalid. *Id*. The *Hughen* court recognized this by stating that "[a]fter *Montejo*, the Sixth Amendment does not bar police-initiated interrogation of an accused who has previously asserted his right to counsel." *Hughen*, 297 S.W.3d at 335.

In this case, pursuant to articles 15.17 and 26.04 of the Texas Code of Criminal Procedure, police brought a magistrate to the hospital for the purpose of arraigning Pecina. This was nothing more than a "preliminary hearing." *Montejo*, 129 S. Ct. at 2091. Indeed, the court of criminal appeals in *Hughen* referred to this procedure as an "initial appearance." *Hughen*, 297 S.W.3d at 332. Therefore, whatever occurred at that preliminary hearing did not even implicate *Edwards* because Pecina had not yet been approached for interrogation nor had he ever unambiguously expressed his desire to deal with the police only through his attorney. *Montejo*, 129 S. Ct. at 2091. I believe that the majority's Fifth Amendment analysis

42

is unnecessary, especially considering that this court expressly held in our first opinion that Pecina had never invoked his right to counsel. *Pecina v. State*, No. 2-05-00456-CR, 2007 WL 1299263, at *7 (Tex. App.—Fort Worth, May 3, 2007) (not designated for publication) ("*Pecina I*").

The court of criminal appeals overruled this court's initial opinion because we had failed to apply *Jackson*—a purely Sixth Amendment issue. *Pecina v. State*, 268 S.W.3d 564, 569 (Tex. Crim. App. 2008) ("*Pecina II*"). The majority's holding in this present judicial orbit of Pecina's case hangs in part upon the court of criminal appeals' statement in its remand that "[j]ust as in *Edwards*, the State showed only that [Pecina] responded to further police-initiated questioning." Majority op. at 31–32 (citing *Pecina II*, 268 S.W.3d at 572). That statement by the court of criminal appeals should not be interpreted to mean anything other than if *Jackson* was still good law, then the imported rule of *Edwards* would have prevented police from initiating interrogation after Pecina had been arraigned. *Jackson*, however, no longer applies; thus, the court of criminal appeals' use of *Edwards*-based language is equally inapplicable. In fact, the *Hughen* court acknowledged that, after *Montejo*, *Edwards* no longer prevents police from questioning an accused who has previously asserted his Sixth Amendment right to counsel. *Hughen*, 297 S.W.3d at 335.

The majority seems to suggest that the *Hughen* court impliedly alluded that it would have decided that case differently had Hughen preserved a Fifth Amendment claim. Majority op. at 31. I do not read the *Hughen* court as hinting that a Fifth Amendment claim would have fared any better than Hughen's Sixth

43

Amendment claim. I read just the contrary. In dicta, because *Hughen* is a purely Sixth Amendment case, the *Hughen* court stated that invocation of a person's Fifth Amendment right requires a specific type of State and defendant interaction: "the Fifth Amendment does bar police-initiated interrogation of an accused who, *in the context of custodial interrogation*, has previously asserted his right to counsel *during such interrogation*, unless the accused's counsel is actually present." *Id.* (emphasis added). In other words, after an arraignment or similar proceeding, police are free to initiate interrogation of an accused who has "previously asserted his right to counsel" during that preliminary hearing. *Id.* And if the accused *then* asserts his Fifth Amendment right to counsel, interrogation must cease. *Id.* at 335, n.5. If the only distinguishable difference between Hughen's case (or other cases like his) and this case is that Pecina was savvy enough to preserve his Fifth Amendment claim for our review, then all police are really free to do is cross their fingers and hope that once they approach a defendant after arraignment and the defendant voluntarily submits to an interrogation, he only contends that his Sixth Amendment rights were violated.

The majority takes issue with my reasoning on this point, contending that somehow my position is making a "mockery of *Miranda.*" Majority op. at 38. As the majority puts it, if my point is correct, "the police need only take a magistrate with them to conduct any custodial interrogation . . . and then they may ignore with impunity any attempt by the defendant to request appointment of counsel from the magistrate." Majority op. at 38.

44

First and foremost, my rebut to this stance by the majority is that I do not have such a harsh view of our law enforcement. I read the record in this case as demonstrating that the officers were doing everything that they could to inform Pecina of his rights. They complied with the mandates of article 15.17 of the Texas Code of Criminal Procedure by taking a magistrate to him, and before they questioned him, they twice read to him his *Miranda* rights. *Pecina II*, 268 S.W.3d at 567. To expect any more of law enforcement would invite the very evil that the *Montejo* court was concerned with in overruling *Jackson*—deterring "law enforcement officers from even trying to obtain voluntary confessions." *Montejo*, 129 S. Ct. at 2091. In fact, it speaks heavily to the voluntary nature of Pecina's statement that he had been warned numerous times concerning his rights to have counsel present when the officers interviewed him, and yet he still chose to confess to his crime.

Furthermore, *Miranda* cannot be mocked if it is not at issue. As the court of criminal appeals noted in its remand, Judge Maddock testified that Pecina "did not indicate that he wanted counsel present before he talked to the detectives." *Pecina II*, 268 S.W.3d at 565. Despite this important fact, the majority summarily concludes that Pecina invoked his right to have counsel present with him during interrogation.

In an attempt to transform Pecina's request for the appointment of counsel into an invocation of counsel for *Miranda* purposes, the majority insists that Judge Maddock's question—after Pecina had requested the appointment of

45

counsel—concerning whether he still wanted to talk to the officers was an action "on behalf of the officers in initiating the interrogation." Majority op. at 37. The majority even ascribes its view to the court of criminal appeals. What the court of criminal appeals actually held was that Judge Maddock's involvement in this case marked "the initiation of adversary judicial proceedings that trigger attachment of the *Sixth Amendment right to counsel*." *Pecina II*, 268 S.W.3d at 568 (emphasis added). That statement says nothing to whether Pecina was being subjected to custodial interrogation when Judge Maddock asked her question. *See Roquemore v. State*, 60 S.W.3d 862, 867 (Tex. Crim. App. 2001) (reasoning that actions that normally attend an arrest and custody, such as informing a defendant of his *Miranda* rights, do not necessarily constitute a custodial interrogation); *see also Montejo*, 129 S. Ct. at 2091 (stating that the Supreme Court has never held that a suspect can invoke *Miranda* rights in a context other than custodial interrogation).

But even if Judge Maddock's question to Pecina whether he wanted to speak to the detectives was part of a conspired interrogation between Judge Maddock and the officers, the majority's position is still fatally flawed because Pecina *never* indicated that he wanted counsel present during interrogation. *Pecina II*, 268 S.W.3d at 565 ("[Judge Maddock] said that [Pecina] did not indicate that he wanted counsel present before he talked to the detectives."). The majority completely ignores firmly established law that in order to invoke counsel for *Miranda* purposes, a suspect's desire to have counsel present during questioning must be unequivocal and

2

unambiguous; otherwise, police officers are not even required to seek clarification, much less halt their interrogation. *See State v. Gobert*, 275 S.W.3d 888, 891 (Tex. Crim. App. 2009) (reasoning that a clear invocation of the right to counsel is an objective inquiry whereby a suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a clear invocation of the right to counsel present during interrogation)(citing *Davis v. United States*, 512 U.S. 452, 461–62, 114 S. Ct. 2350, 2371 (1994)); *see also Dalton v. State*, 248 S.W.3d 866, 869 (Tex. App.—Austin, 2008 pet. ref'd), *cert. denied,* 130 S. Ct. 555 (2009) (reasoning that a suspect's statement to officers must be a direct and unequivocal assertion of the right to have counsel present during interrogation before officers are required to halt any further questioning).

What the majority does today is effectively revive *Jackson* and hold that any defendant who is arraigned pursuant to articles 15.17 and 26.04 of the Texas Code of Criminal Procedure can never be approached by police and asked whether the defendant wants to voluntarily confess to the crime for which he stands accused. *Jackson*, 475 U.S. at 635, 106 S. Ct. at 1411. This holding is contrary to both *Montejo* and *Hughen*. *See Montejo*, 129 S. Ct. at 2091; *Hughen*, 297 S.W.3d at 335.

The majority applies the *Miranda-Edwards* regime to this preliminary hearing whereby Pecina affirmatively stated that he wanted a court-appointed attorney. The

3

majority builds its premise on the notion that the "Court in *Montejo* assures us that the *Miranda-Edwards-Minnick* regime is 'not in doubt.'" Majority op. at 32–33 (citing *Montejo*, 129 S. Ct. at 2090). I agree that the *Miranda-Edwards* regime is not in doubt. But there is a distinction between whether that regime is in doubt and whether it applies to a certain set of facts. As the *Montejo* court stated, although the *Miranda-Edwards* regime is not in doubt, those protections are "narrower than *Jackson*." *Montejo*, 129 S. Ct. at 2090.

The majority treats the *Montejo* decision as a simple exercise in eliminating redundant case law and as if *Jackson* and the *Miranda-Edwards* regime provided the same exact protections. While it is true that the *Montejo* court reasoned that an individual's rights were adequately protected by the *Miranda-Edwards* regime, the Supreme Court had far more negative things to say about *Jackson* than that it was simply superfluous or redundant to the *Miranda-Edwards* regime. The *Montejo* court was concerned that *Jackson* was thwarting "society's compelling interest in finding, convicting, and punishing those who violate the law." *Id.* at 2089 (quoting *Moran v. Burbine*, 475 U.S. 412, 425–426, 106 S. Ct. 1135, 1144 (1986)). The *Montejo* court reasoned that at best, *Jackson* was simply adding a protection already existing by way of the *Miranda-Edwards* regime, but at its worst, *Jackson* was operating to eliminate "confession[s] given by the free choice of suspects who have received proper advice of their *Miranda* rights but waived them nonetheless." *Montejo*, 129 S. Ct. at 2089. The iniquity of this paradigm is that without voluntary confessions,

4

"crimes go unsolved and criminals unpunished [and] these are not negligible costs." *Id.* at 2090 (*citing Cobb*, 532 U.S. at 175, 121 S. Ct. at 1335 (Kennedy, J., concurring)). Not only did *Jackson* result in the exclusion of voluntary confessions, thereby "letting guilty and possibly dangerous criminals go free," but it also "deter[ed] law enforcement officers from even trying to obtain voluntary confessions." *Montejo*, 129 S. Ct. at 2086. Voluntary confessions, as the *Montejo* court pointed out, are "not an evil, but an unmitigated good." *Id.* at 2090 (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S. Ct. 2204, 2212 (1991).

There is no better example than Pecina's case to show why the *Montejo* court overruled *Jackson.* Pecina is a "guilty and possibly dangerous criminal" who fatally stabbed his very own wife over fifty times. He acknowledged to the magistrate at his arraignment that he was willing to talk to the police and he later admitted to the police, voluntarily, that he had argued with his wife about her wanting to leave him; that he had become angry; that he had cut her; and that no one else was present but the two of them when he had done so. Without this voluntary confession, this heinous crime could have possibly gone unsolved and Pecina could have gone unpunished. That is not a negligible cost, considering that Pecina never indicated that he did not wish to speak to police when they approached him for interrogation.

Yet again, the majority takes issue with my position in this regard. The majority casts my position as a simple equation: Pecina is guilty; thus, he should be

punished. Majority op. at 38. That of course is not my position and the majority fails to address my point in its entirety. It is not simply that Pecina is guilty; rather, he is a guilty criminal who *voluntarily confessed to his crime*. As the *Montejo* court stated, eliminating voluntary confessions obtained without coercion and deterring law enforcement from even trying to obtain them "are not negligible costs." *Montejo*, 129 S. Ct. at 2090.

What the majority ultimately has done is apply the *Miranda-Edwards* regime to this case based on what Pecina said at his arraignment. To be sure, the *Montejo* court was not concerned with what "statements [were] made at [a] preliminary hearing." *Id.* at 2091. That is because, as the *Montejo* court stated, they "have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation' . . . ." *Id.* (quoting *McNeil,* 501 U.S. at 182, n.3, 111 S. Ct. at 2212, n.3).

I would hold that when Pecina acknowledged that he wanted court-appointed counsel as the magistrate arraigned him at the hospital he had not invoked his Fifth Amendment rights under *Miranda-Edwards*, the police were entitled to approach him for interrogation, and he made a voluntary statement that was properly admitted by the trial court. Therefore, I dissent.


DIXON W. HOLMAN
JUSTICE


6

PUBLISH

DELIVERED:  July 15, 2010