**Theodore Saron WILLIAMS, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–01–037–CR.**

Court of Appeals of Texas,
Fort Worth.

Aug. 27, 2004.

---

Robert Kersey, Granbury, for Appellant.

Richard L. Hattox, Granbury, for State.

PANEL F: DAUPHINOT, HOLMAN, and GARDNER, JJ.

## OPINION ON REMAND

ANNE GARDNER, Justice.

Appellant Theodore Saron Williams was convicted by a jury for the offense of felony driving while intoxicated. Upon consideration of the case on remand from the Texas Court of Criminal Appeals, we will reverse and remand.

### Procedural Background

In an opinion dated April 11, 2002, we overruled all four of Appellant's issues and affirmed the trial court's judgment. *Williams v. State*, 74 S.W.3d 902, 905 (Tex. App.-Fort Worth 2002), *rev'd*, 116 S.W.3d 788 (Tex.Crim.App.2003). In his first two issues,[1] Appellant argued that the trial court abused its discretion in denying his request to provide the jury with a personal demonstration of his speaking ability and the physical condition of his mouth at the time of his trial without subjecting himself to cross-examination. *Id.* at 903. Appellant argued that such evidence would show that his speech normally sounds slurred because he is missing many of his teeth. We addressed Appellant's first two issues in tandem and upheld the trial court's ruling. *Id.* at 903–04.

Thereafter, Appellant filed a petition for discretionary review. On October 2, 2002, the court of criminal appeals granted two of the three grounds enumerated in Appellant's petition for discretionary review. *Williams v. State*, No. 1015–02 (Tex.Crim. App. Oct. 2, 2002) (granting on grounds one and two) (available at http://www.cca.courts.state.tx.us/opinions/10022002hd.htm.). Appellant presented his first ground for discretionary review as follows: "Whether defendants may personally provide voice exemplars or other demonstrations to the jury as part of their defense, without fear of cross-examination by the State?"[2] The Texas Court of

---

**1.** Issue One: Whether the trial court erred in not allowing Appellant to demonstrate his normal faculty of speech to the jury.

Issue Two: Whether the trial court erred in refusing to let defense counsel show the jury the condition of Appellant's mouth.

**2.** We observe, however, that Appellant's prayer for relief in his brief on his petition for

Criminal Appeals reversed solely on Appellant's first ground, holding "that a voice exemplar is not testimonial and therefore does not waive a defendant's right to be free from self-incrimination." *Williams*, 116 S.W.3d at 790. Notably, the court did not specifically reference "other demonstrations," such as showing the jury the condition of an appellant's mouth, as Appellant requested at trial. The court then remanded the case to us "for proceedings consistent with this opinion." *Id.* at 793.

### Scope of Appeal on Remand

As the court of criminal appeals recognized in *Carroll v. State*, "The Rules of Appellate Procedure ... do not specifically address the scope of an intermediate appellate court's review following a remand from [the Texas Court of Criminal Appeals]." 101 S.W.3d 454, 456 (Tex.Crim. App.2003). In *Carroll*, however, the court held that "the courts of appeals are not limited on remand to deciding the pertinent point of error based solely on the explicit basis set out by this Court in a remand order." *Id.* at 459. Accordingly, while the court of criminal appeals's holding on Appellant's petition for discretionary review pertains only to Appellant's voice exemplar and does not specifically address his complaint as to the denial of his request to show the jury the condition of his mouth, we will reexamine our holding on the latter issue before turning to the question of whether Appellant was harmed by the trial court's rulings.

◼ Appellant asserts in his second issue that the trial court erred in denying him the opportunity to show his mouth to the jury, which would have shown that he has no upper teeth and at least three missing lower teeth. He argues that this evidence would show what actually caused his speech to appear slurred in the videotape from the intoxilyzer room following his DWI arrest. In *Laird v. State*, we held that "it is not a violation of a defendant's right against self-incrimination to require him to smile, or otherwise open his mouth to let the jury view the status of his teeth. This act is not testimonial." 650 S.W.2d 198, 202 (Tex.App.-Fort Worth 1983, pet. ref'd). Such evidence is not testimonial, "whether it is offered by the State or the defendant." *Williams*, 116 S.W.3d at 793; *see Laird*, 650 S.W.2d at 202. Accordingly, we now hold that a defendant who offers evidence of the physical condition of his or her mouth "does not waive his Fifth Amendment rights and does not subject himself to cross-examination." *Williams*, 116 S.W.3d at 793; *see Laird*, 650 S.W.2d at 202.

◼ We therefore conclude that the trial court abused its discretion in refusing Appellant's request to permit him to provide the jury with a personal demonstration of his speaking ability and the physical condition of his mouth at the time of his trial without subjecting himself to cross-examination.

### Analysis of Appellant's Issues on Remand

◼ Because the trial court erred, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. *See* Tex.R.App. P. 44.2. Neither Appellant nor the State is required to prove harm from a trial court's error; rather, it is our duty as the reviewing court to assess harm from the context of the error. *Johnson v. State*, 43 S.W.3d 1,

---

discretionary review asks the court of criminal appeals, in part, to "hold that the Second Court of Appeals erred in affirming the trial court's ruling not to allow the Appellant to demonstrate his voice before the jury without being subject to cross-examination." Appellant's prayer does not request relief from the denial of any "other demonstrations."

4 (Tex.Crim.App.2001). It is unnecessary to decide whether the error was constitutional because, even under the less stringent non-constitutional harm standard, we conclude that the error was harmful. Therefore, assuming, but without deciding, that the error was not constitutional, we conduct a harm analysis under rule 44.2(b). Tex.R.App. P. 44.2(b) (stating any error that does not affect an appellant's substantial rights must be disregarded); *see Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim.App.1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999); *Coggeshall v. State,* 961 S.W.2d 639, 642–43 (Tex.App.-Fort Worth 1998, pet. ref'd) (en banc).

▮▮▮▮ A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *Johnson,* 43 S.W.3d at 3–4; *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App. 1997) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). The United States Supreme Court explained in *Kotteakos:*

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment *was not substantially swayed* by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had *substantial influence.* If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 765, 66 S.Ct. at 1248; *see also Russell v. State,* 113 S.W.3d 530, 549–50 (Tex.App.-Fort Worth 2003, pet. ref'd). According to the Supreme Court, "grave doubts" means that "in the judge's mind, the matter is so evenly balanced that he [or she] feels himself [or herself] in virtual equipoise as to the harmlessness of the error." *Russell,* 113 S.W.3d at 550 (citing *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995)). "If the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, that is, as having a substantial and injurious effect or influence in determining the jury's verdict." *Id.*

▮▮▮▮ In assessing the likelihood that the error adversely affected the jury's decision, we consider everything in the record, including all evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how the error might have been considered in connection with the other evidence. *Morales v. State,* 32 S.W.3d 862, 867 (Tex.Crim.App.2000); *James v. State,* 102 S.W.3d 162, 179 (Tex. App.-Fort Worth 2003, pet. ref'd). We may also consider the State's theory of the case, any defensive theories, closing arguments, and voir dire. *Morales,* 32 S.W.3d at 867; *James,* 102 S.W.3d at 179. Evidence of a defendant's guilt, especially if it is overwhelming, is also a factor to be considered in conducting a harm analysis. *Motilla v. State,* 78 S.W.3d 352, 358 (Tex. Crim.App.2002). But as stated in *Harris v. State:*

> [A] reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction.... If the error was of a magnitude that it disrupted the [jurors'] orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted. Again, it is the effect of the error and not the other

evidence that must dictate the reviewing court's judgment.

790 S.W.2d 568, 587–88 (Tex.Crim.App. 1989); *see also Russell,* 113 S.W.3d at 550.

Appellant was charged with felony driving while intoxicated on December 28, 1999. During trial, Appellant stipulated to two prior DWI convictions. According to the State's evidence, he was pulled over after failing to signal and for driving in two lanes of traffic. When Officer Robert Young approached Appellant, he detected the odor of an alcoholic beverage coming from Appellant and his car. Officer Young testified that Appellant fumbled with his wallet and "had some slurred speech." Officer Young asked Appellant to get out of his car, and Appellant did so, "us[ing] his hand on his vehicle to guide his way to . . . the back of his vehicle."

Officer Young testified that he conducted the horizontal gaze nystagmus test on Appellant and testified that the test indicated that Appellant was impaired. Officer Young also testified that he asked Appellant to perform the one-legged stand test. According to Officer Young's testimony, Appellant "stated that he could not perform the test, and he attempted the test for approximately two seconds" before putting his foot on the ground. Finally, Officer Young requested that Appellant take the nine-step-walk-and-turn test. Officer Young testified that Appellant did not follow directions, starting before he was told to begin, failing to touch any of the steps heel to toe, and failing to count aloud. Appellant twice asked what step he was on, and he continued counting beyond nine steps, taking thirteen steps in total.

Officer Young testified that he then asked Appellant to touch his thumb to each of his fingers and count aloud one-two-three-four, four-three-two-one. Officer Young stated that Appellant

was unable to touch his thumb to his forefingers, and the counting was slurred. I couldn't understand if he was saying numbers or what he was saying. He was looking down at his hand trying to manipulate his fingers and, I assume, attempting to count, but I couldn't understand what he was saying.

Officer Young opined that, based on his observations and testing of Appellant, Appellant was intoxicated at the time he pulled him over.

After Officer Young arrested the passenger of the car for public intoxication, he searched the vehicle and found, among other things, "a six-pack of Milwaukee beer in a brown paper bag and five open Milwaukee beer cans, 12–ounce cans, in the rear passenger area." Appellant was taken to the Hood County Jail intoxilyzer room, where he was observed and read his statutory DWI warnings. While in the intoxilyzer room, Officer Young asked Appellant what his middle initial "S" stood for. Appellant first responded, "Shit," and Officer Young testified that he asked him again to state his middle name. Officer Young testified that "[Appellant] began to slur the words, and I couldn't understand what he was trying to tell me." Officer Young testified that after he had read the statutory DWI warning to Appellant, Appellant refused to provide a specimen of his breath.

Deputy Michael Holly testified that he was riding with Officer Young on December 28, 1999 and observed Appellant's arrest. Deputy Holly testified that he "s[aw] enough of these field sobriety tests to understand what was going on," saw how Appellant interacted with Officer Young, and heard Appellant talk. Deputy Holly testified that he formed the opinion that Appellant was intoxicated and could not safely operate a motor vehicle.

Finally, Officer Frederick Bauer testified for the State that he is the Chief Administrator for the Hood County Sheriff's Department and that he provided assistance with Appellant's arrest on December 28, 1999. Officer Bauer testified that he drove Appellant to the county jail. When asked whether Officer Bauer noticed anything unusual about Appellant, Officer Bauer stated, "There was a strong smell of alcohol beverage [sic] in the patrol unit that wasn't there before he got into the vehicle." Officer Bauer also testified that "[h]is speech was slurred." Officer Bauer testified that Appellant tried to talk to him, but Officer Bauer stated that he tried to limit conversation because "[h]e was intoxicated, and I didn't want to carry on a conversation with an intoxicated person."

According to Officer Bauer, when he asked Appellant to get out of his patrol car, Appellant became "belligerent" and "told [him] to take [his] fucking hands off of him." Officer Bauer stated that he had to physically remove Appellant from the car. Officer Bauer testified that Appellant "went limp" and would not stand up. Appellant accused Officer Bauer of hitting him in the face, but Officer Bauer testified that he did not hit Appellant and that "[he] brushed [Appellant's] face with [his] hand" when Appellant went limp and his "head went down through the jacket."

Officer Bauer took Appellant to the intoxilyzer room, where Appellant was videotaped. Officer Bauer testified that he observed Appellant in the intoxilyzer room, interacted with Appellant, saw him interact with other officers, and heard him speak. Based on his observations of Appellant, Officer Bauer opined that Appellant was intoxicated. On cross-examination, Officer Bauer testified that he had never met Appellant before and did not know about his normal demeanor or what he normally sounded like.

The State then played the roughly ten to fifteen minute long videotape from the intoxilyzer room for the jury. Throughout the time Appellant was in the intoxilyzer room, he stood in a painted square on the floor. On the tape, Appellant appears to stand still without swaying or using his arms for balance while awaiting the arrival of the arresting officer and during subsequent questioning. Appellant speaks with several of the officers in the room, asking them if they know or have heard of various people. Despite Officer Young's testimony that he could not understand what Appellant was saying (after Appellant stated that his middle name was "Shit"), the videotape shows Appellant saying and spelling his middle name. Among other things, the tape shows Appellant, at one point, saluting the officer who was reading his statutory DWI warnings, and it shows Appellant asking for a trash can in which he could throw away his copy of the warnings after they were read to him. Appellant decided, however, to keep his copy, placing the paper in his pocket. The videotape also shows Appellant's refusal to provide a specimen of his breath.

The State rested after calling these three witnesses and playing the videotape. After the trial court denied Appellant's request to provide the jury with a personal demonstration of his speech and the condition of his mouth, Appellant rested. Each side then argued its case to the jury. Appellant's counsel argued, in part, that the arresting officers "don't know his normal demeanor" or "his normal speech." Counsel further stated, "They didn't really have any basis upon which to judge him, except what they saw that day and their own past experiences. But what we have got here is a suspicion, but not proof."

During the rebuttal portion of the State's closing argument, the State reminded the jury of Appellant's demeanor,

"how he looks and talks." The State suggested that Appellant's poor performance on the field sobriety tests, his not paying attention as the officer read his statutory warnings, his attitude toward the officers, and his giving the word "shit" as his middle name, among the other evidence, tended to prove that he was intoxicated. The State also argued,

> *His speech says it all.* Even with the worse [sic] speech impediment or defect in the world, nobody sounds like that unless you have had too much alcohol. These officers could hardly understand him on many occasions when he would force it, concentrate some, see, and get it out. But when he's thinking about one thing and trying to say another, it all comes out. That is the divided attention problem that alcohol causes for you. [Emphasis added.]

The State encouraged the jury to view the videotape again and argued,

> If you think there is any question at all this defendant didn't have the normal use of his faculties, just look at it. And it is just obviously clear that *nobody would act like this, look like this, talk like this or respond this way, unless it was the alcohol doing the talking and walking for him.* And that's what you have before you. [Emphasis added.]

All three officers who opined that Appellant was intoxicated based their opinion in part on the fact that Appellant's speech sounded slurred. Indeed, the videotape shows that Appellant's speech was slurred and difficult to understand at times. This fact was highlighted by Officer Young's testimony that he could not understand Appellant and by the videotape, on which the officer repeatedly asked Appellant to say his middle name because he could not understand what Appellant was saying. During its closing argument, the State repeatedly called attention to Appellant's speech and urged the jury to find him guilty, in large part, based on his speech, arguing that "[h]is speech says it all." In listening to the audiotape of Appellant reading a portion of the court's charge, which was made for his bill of exceptions, we observe that Appellant's speech sounds slurred and is similar to the sound of his speech on the videotape from the intoxilyzer room. Of course, the jury did not have the ability to compare Appellant's speech on the night of his arrest to his normal manner of speech and did not have a basis to believe that Appellant's speech was affected by factors other than or in addition to the consumption of alcohol.

■ Based on our thorough review of the record, including the videotape and the audiotape, we cannot say with fair assurance that the error in this case did not influence the jury's determination of Appellant's guilt or that it had only a slight effect. *See* Tex.R.App. P. 44.2(b); *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248; *Russell,* 113 S.W.3d at 549–50. Because the State emphasized and heavily relied on evidence of Appellant's manner of speech, even with other evidence tending to show that Appellant was intoxicated at the time of his arrest, the error in disallowing Appellant to present a personal demonstration of his manner of speech and the condition of his mouth so disrupted the jury's orderly evaluation of the evidence that his conviction is tainted. *See Harris,* 790 S.W.2d at 587–88; *Russell,* 113 S.W.3d at 550. We therefore hold that the trial court's erroneous exclusion of Appellant's personal demonstration of his speaking ability and the physical condition of his mouth during trial constituted harmful error. *See* Tex.R.App. P. 44.2(b); *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248; *Harris,* 790 S.W.2d at 587–88; *Russell,* 113 S.W.3d at 550; *see also Elmore v. State,* 116 S.W.3d 809, 815–16 (Tex.App.-Fort Worth

2003, pet. ref'd) (holding trial court's erroneous exclusion of letter affected defendant's substantial rights); *Sunbury v. State,* 33 S.W.3d 436, 442–43 (Tex.App.-Houston [1st Dist.] 2000) (holding trial court's erroneous exclusion of defendant's rebuttal evidence during sentencing phase was not harmless error under Tex.R.App. P. 44.2(b)), *aff'd,* 88 S.W.3d 229 (Tex.Crim. App.2002). Appellant's first two issues are sustained.

### Conclusion

Having sustained Appellant's first two issues, we reverse the trial court's judgment and remand this cause for a new trial.