COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

JEREMY DONTAE CRAFT, § 

§ No. 08-10-00107-CR

Appellant, §

§ Appeal from the

v. §

§ Criminal District Court Number Three

§

THE STATE OF TEXAS, § of Tarrant County, Texas

§

Appellee. § (TC# 1121299D)

§

O P I N I O N

Appellant Jeremy Dontae Craft was indicted for the offenses of aggravated sexual assault and threatened aggravated sexual assault.[1] The indictment also included a deadly weapon finding notice. Appellant entered a plea of not guilty to the charged offenses and a plea of not true to the deadly weapon finding notice, and proceeded to a trial on the merits. The jury found Appellant guilty of the charged offenses and made a finding of true relative to the use of a deadly weapon. At the conclusion of the punishment phase of the trial, the jury assessed punishment at ninety-nine (99) years confinement in the Institutional Division of the Texas Department of Criminal Justice. Appellant raises two issues in this Court. First, that the trial court erred in denying his *Batson* challenge;[2] and second, that the trial court erred by admitting evidence of extraneous conduct in violation of the Texas Rules of Evidence.

*Background*

---

[1] This case was transferred from the Second Court of Appeals to this Court pursuant to a docket equalization order entered by the Texas Supreme Court. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2005). We have applied precedent of the Fort Worth Court of Appeals. *See* TEX.R.APP.P. 41.3.

[2] *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d (1986).

On May 29, 2008, N.S. was living with her mother on 5554 Norris Street in Fort Worth. Appellant had just moved into the house on a temporary basis at the request of N.S.'s mother. N.S. and Appellant had known each other from the time that they were very young.

Early that morning, N.S. drove her mother to work. When she returned to the house, N.S. saw Appellant pacing the entrance hall with a baseball bat in his hand. She put down her cell phone and car keys and walked into her bedroom to get dressed. N.S. heard Appellant call her name. When she turned around, she saw Appellant standing in her room with a baseball bat in one hand and a long, wide knife with a thick handle in the other. Appellant ordered her to take off her clothes and get on the bed. She initially thought it was some type of joke and told Appellant she would not take off her clothes.

Appellant moved closer to her and repeated his demand that she remove her clothes. When she still did not comply, Appellant grabbed N.S. by the hand and took her into the next bedroom. Appellant repeatedly instructed her to remove her clothes and threatened to "knock [her] out." Appellant threw her on the bed. He then dropped the knife and the bat and began to use his fists to punch her in the face, doing so five or six times. Blood started coming out of a wound above her right eye as Appellant continued to hit her on the whole right side of her body. Using both of his hands, Appellant removed her clothes, told her he was going to kill her, and kill himself. He then removed his own clothes and forced his penis into her.

When Appellant finally stopped sexually assaulting N.S., he allowed her to put her clothes back on. He also put a Band-Aid on the cut above her eye. Appellant informed N.S. that if she told anyone about the sexual assault, he would kill her. She told him that she would not tell anyone. He permitted her to leave the house, and told her that he was going to wait for the police.

N.S. fled to Appellant's aunt's house which was nearby and told her what happened. Appellant's aunt called the police. An Emergency Medical Technician, Richard Hoover, testified that his ambulance was dispatched to 2301 Riverside Drive at around 8:15 a.m. on May 29, 2008. Upon his arrival, Mr. Hoover found N.S. sitting in a car and crying. She told him that she had been raped and complained about pain. She repeated that she had been punched and sexually assaulted.

A physical exam of N.S. revealed injuries which were consistent with having been punched in the face and about the body with a fist. A sexual assault exam revealed injuries which were consistent with non-consensual sexual intercourse.

As noted above, the jury found Appellant guilty of aggravated sexual assault and threatened aggravated sexual assault and made a finding of true relative to the use of a deadly weapon. The jury assessed punishment at ninety-nine (99) years confinement in the Institutional Division of the Texas Department of Criminal Justice.

In his first issue on appeal, Appellant argues that the trial court erred in denying his *Batson* challenge.

## Standard of Review

A defendant objecting under *Batson* must make a prima facie showing of racial discrimination in the State's exercise of its peremptory strikes. *Williams v. State*, 301 S.W.3d 675, 688 (Tex.Crim.App. 2009), *cert. denied*, --- U.S. ----, 130 S.Ct. 3411, 177 L.Ed.2d 326 (2010). The burden then shifts to the State to articulate race-neutral explanations for its strikes. *Williams*, 301 S.W.3d at 688. Once the prosecutor has articulated race-neutral explanations, the burden shifts back to the defendant to show that the explanations are really a pretext for discrimination. *Id.* The trial court must then determine whether the defendant has carried his

burden of proving discrimination. *Id.* The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous. *Id.*; *Watkins v. State*, 245 S.W.3d 444, 448 (Tex.Crim.App.), *cert. denied*, 555 U.S. 846, 129 S.Ct. 92, 172 L.Ed.2d 78 (2008).

Appellate courts must give great deference to credibility and demeanor determinations made by the trial court in connection with a *Batson* inquiry, and the Court of Criminal Appeals has explained our review of a *Batson* ruling as follows:

> In assaying the record for clear error, *vel non*, the reviewing court should consider the entire record of *voir dire*; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. But a reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.

*Watkins,* 245 S.W.3d at 448 [Citations omitted]. Factors that the United States Supreme Court has considered to determine whether peremptory challenges were used on a racially discriminatory basis include: (1) whether the State struck a higher percentage of African-Americans than non-African-Americans; (2) whether the State's reasons for striking African-Americans appeared to apply equally to non-African-Americans whom the State did not strike; (3) whether the State used jury shuffles in a manner that supported an inference of racial discrimination; (4) whether the State questioned African-Americans and non-African-Americans differently and in a way designed to obtain answers justifying strikes of African-Americans; and (5) whether the county in which the defendant was prosecuted had a formal policy of excluding

minority jurors from service.  *See Miller-El v. Dretke*, 545 U.S. 231, 240-64, 125 S.Ct. 2317, 2325-39, 162 L.Ed.2d 196 (2005).

*Application*

Preliminarily, the record is unclear as to the racial make-up of the panel as a whole. Further, there is no indication as to the race of veniremembers # 3 and # 8.[3]  On the other hand, the record does reflect that three African-Americans were disqualified by agreement of the parties.  One African-American claimed an exemption.  Two African-Americans were successfully challenged for cause by the State without objection from the defense.  Two African-Americans were peremptorily challenged by the State, and one African-American was peremptorily challenged by Appellant.  Finally, an African-American individual was selected as the alternate juror.

At the conclusion of *voir dire*, Appellant's counsel raised a *Batson* objection challenging the State's peremptory strike of veniremembers # 3 and # 8, arguing that there was no race-neutral reason why those veniremembers were struck.

In Response, the State argued that venireperson # 3 "expressed a general hesitation to believing the victim and returning a verdict of guilty" in the absence of scientific evidence, and that venireperson # 8 initially stated that while he understood the law requires only proof beyond a reasonable doubt, he would require 100 percent proof from the State before he could return a verdict of guilty.  The State also noted that during the defense *voir dire*, venireperson # 8 gave equivocating answers to the questions posed to him, and changed his mind with ease based on the answers provided by another venireperson.

---

[3] Although, given the nature of Appellant's *Batson* challenge, the fact that Appellant is African-American, and considering the discussion between defense counsel, the prosecutor, and the trial court regarding the *Batson* challenge, it is safe to assume that veniremembers # 3 and # 8 are African-American.

Because the State offered race-neutral reasons for the exercise of its peremptory strikes, the burden shifted back to Appellant to establish that the State's explanations were a pretext for discrimination.

At trial, Appellant did not contest the explanation offered by the State as to venireperson # 3. As to the explanation offered by the State with respect to venireperson # 8, Appellant argued that the venireperson had sufficiently rehabilitated himself during the defense *voir dire* such that he could not be challenged for cause, and as a result, there was no race-neutral reason to strike him.

The trial court found that venireperson # 3 indicated that she was unable to make a decision based on witness testimony alone, and that she would require proof of scientific evidence based on her scientific background. With respect to venireperson # 8, the court found that his answers "kind of went back and forth several times." The court determined that venireperson # 8 was "absolutely positive . . . that the State would have to bring him proof beyond a reasonable doubt, a hundred percent." In both cases, the trial court necessarily determined that the race-neutral reasons offered by the State for the exercise of its peremptory challenges were not pre-textual. We agree.

The total venire consisted of seventy persons. Following *voir dire,* the final panel consisted of thirty-eight venirepersons, including four African-Americans. Of the four remaining African-American venirepersons, the State struck two and the defense struck one. The final African-American venireperson was selected as the alternate juror.

In considering the *Miller-El* factors, the State did not strike a higher percentage of African-Americans than non-African-Americans. Both sides had ten peremptory strikes available to them. Of those, the State exercised two (20 percent) against African-American

6

venirepersons, and seven (70 percent) against non-African-American venirepersons.[4] The defense exercised one (10 percent) of its ten peremptory strikes against an African-American venireperson.

Our review of the entire *voir dire* record reveals no disparate treatment by the State between African-American venirepersons and non-African-American venirepersons. The prosecutor's inquiries of the panel as a whole were not discriminatory, nor were different questions posed to African-American members of the panel than to non-African-American members. There is nothing in the record identifying any other African-American venireperson who could have been challenged by the State, but was not, on the basis of the State's proffered reasons for challenging venirepersons # 3 and # 8.

The record is devoid of evidence that the State utilized a jury shuffle in a manner that supports an inference of racial discrimination, and there is no evidence that the county in which Appellant was tried has a policy to exclude minorities or a history of purposefully excluding minorities from jury service.

Under the circumstances in this case, we cannot conclude that Appellant made a *prima facie* showing of racial discrimination. Nevertheless, assuming Appellant made his *prima facie* showing, we cannot say, based on this record, that the trial court's decision to deny his *Batson* challenge was clearly erroneous. Appellant's first issue is overruled.

### *Extraneous Evidence*

Next, Appellant argues that the trial court erred when it admitted evidence of extraneous conduct in violation of the Texas Rules of Evidence. Specifically, Appellant argues that the trial

---

[4] The State used only nine of its ten available peremptory strikes.

court admitted extensive evidence of an arson offense that implicated Appellant, but which failed to prove Appellant had committed the arson offense. Rather, the evidence established only that Appellant was in the area of the fire.

The challenged extraneous conduct evidence is that N.S.'s mother, Pamela Wall, testified that after leaving the hospital where her daughter was being examined, she saw Appellant walking down Berry Street and attempted to confront him. Appellant fled to a nearby apartment complex while Ms. Wall chased him yelling "he just raped my baby." Ms. Wall repeatedly banged on the door of the apartment in which Appellant was hiding and demanded that he come out. At some point, she left and hid behind the apartment building to wait for Appellant to exit the apartment. When he did, Ms. Wall confronted Appellant and asked why he had raped her daughter. Appellant responded "the bitch deserved it," and ran away.

Later that afternoon, Officer Phillips and his partner received a report that Appellant had been spotted in an apartment complex at 2201 E. Berry. When they arrived at the apartment complex, the officers were informed that there was a fire in one of the apartments. Other police officers informed Officer Phillips that Appellant had been seen "running from the location of the fire." Officer Phillips and his partner were unable to locate Appellant at that time.

An investigator with the Arson and Bomb Division of the Fort Worth Fire Department testified that a mattress and bedding in the bedroom of a residence in the apartment complex had been intentionally set on fire.

The State argued that the testimony related above was admissible as evidence of consciousness of guilt given Appellant's actions in attempting to evade capture by the police.

The defense countered that the testimony was not relevant because it established only that Appellant was seen in an area in close proximity to an apartment complex where a fire had been

8

intentionally set. Appellant further argues that because the arson investigator had no knowledge of who set the fire, any evidence that Appellant was possibly an arsonist fails to make a fact of consequence more or less probable thereby rendering such evidence irrelevant.

*Standard of Review*

When reviewing a trial court's decision to admit extraneous offense evidence under Rule 404(b), or over a Rule 403 objection, an appellate court applies an abuse-of-discretion standard. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex.Crim.App. 2009). A trial court abuses its discretion only when its decision lies outside "the 'zone of reasonable disagreement.'" *Id*. at 343-44. The general rule is that the defendant is to be tried only for the offense charged, not for any other crimes or for being a criminal generally. *Segundo v. State*, 270 S.W.3d 79, 87 (Tex.Crim.App. 2008); *Crank v. State*, 761 S.W.2d 328, 341 (Tex.Crim.App. 1988). Evidence of extraneous acts of misconduct may be admissible if (1) the uncharged act is relevant to a material issue in the case, and (2) the probative value of that evidence is not significantly outweighed by its prejudicial effect. *Segundo*, 270 S.W.3d at 87.

Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R.EVID. 401; *Rankin v. State*, 974 S.W.2d 707, 709 (Tex.Crim.App. 1996).

"Evidence of other crimes, wrongs or acts" may not be admitted during the guilt-innocence phase of trial "to prove the character of a person in order to show action in conformity therewith." TEX.R.EVID. 404(b); *Marc v. State*, 166 S.W.3d 767, 775 (Tex.App.--Fort Worth 2005, pet. ref'd). Such evidence of extraneous offenses may be admitted to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

TEX.R.EVID. 404(b). The Court of Criminal Appeals has explained, "'Rule 404(b) is a rule of inclusion rather than exclusion.' The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *De La Paz*, 279 S.W.3d at 343 [Footnotes omitted]. The State, as the proponent of extraneous offense evidence, bears the burden of showing admissibility. *Russell v. State*, 113 S.W.3d 530, 535 (Tex.App.--Fort Worth 2003, pet. ref'd); *Rankin v. State*, 974 S.W.2d 707, 718 (Tex.Crim.App. 1996)(op. on reh'g).

*Application*

Appellant argues that the State's attempt to portray him as an arsonist fails to make a fact of consequence more or less probable relative to the trial on the charged offenses of aggravated sexual assault and threatened aggravated sexual assault, and that the only purpose of the extraneous conduct evidence was to establish that Appellant must be guilty of the charged offenses if he was willing to commit another offense. We disagree.

The fact of consequence to which Appellant's flight was relevant was his knowledge or consciousness of guilt of the charged offenses, rather than the possible arson. Evidence of flight may establish a defendant's guilt because, unlike other extraneous offenses, it "shows a consciousness of guilt of the crime for which the defendant is on trial." *Bigby v. State*, 892 S.W.2d 864, 884 (Tex.Crim.App. 1994), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004). The fact that other extraneous offenses are committed while in flight does not render such evidence inadmissible, and so long as the extraneous offense is shown to be related to the circumstances of the defendant's flight, they may be admitted. *Foster v. State*, 779 S.W.2d 845, 859 (Tex.Crim.App. 1989)(evidence that a defendant shot a victim, stole his car, and later took other hostages in an effort to flee from police

10

admissible as part of evidence of flight); *Bigby*, 892 S.W.2d at 883 (evidence that defendant stole a pistol and threatened judge before being physically subdued by judge, assistant district attorney, and bailiff admissible as evidence of flight); *Arivette v. State,* 513 S.W.2d 857, 862 (Tex.Crim.App. 1974)(evidence that defendant kidnapped several individuals, shot a hostage, and killed a deputy admissible as evidence of flight).

Here, Appellant was seen fleeing from the apartment complex in which the fire was started. His flight and apparent efforts to ensure its success were clearly relevant to establish knowledge – consciousness of guilt.

Next, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX.R.EVID. 403.

Once a Rule 403 objection is made, the trial court must weigh the probative value of the evidence to determine if it is substantially outweighed by its potential for unfair prejudice. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex.Crim.App. 1997). A Rule 403 balancing test includes the following factors: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 & n.8 (Tex.Crim.App. 2006).

### 1. Probative Value and Need

The trial court could have concluded that the extraneous offense evidence was highly probative to show Appellant's knowledge and consciousness of guilt. He fled the scene of the rape and when confronted by the victim's mother at the apartment complex, stated "the bitch deserved it." He fled the confrontation with the victim's mother, and later, as the police approached, fled the apartment complex where a fire had been started. It was certainly a reasonable inference from the evidence presented that Appellant started the fire to aid his flight from the apartment complex. This evidence was of value in establishing Appellant's consciousness of guilt.

### 2. Unfair Prejudice

The trial court could have reasonably determined that the extraneous offense evidence did not have a tendency to suggest a decision on an improper basis. Although the extraneous evidence had the potential to evoke an emotional response in the jury, it is clear from the record that the State introduced the evidence to establish Appellant's consciousness of guilt of the charged offenses, and not to paint him as an arsonist. Additionally, the trial court instructed the jury that it could only consider the extraneous offense evidence "in determining the motive, intent, preparation, plan, knowledge, absence of mistake or accident, for this defendant now on trial before you, or rebuttal of a defensive theory and for no other purpose."

### 3. Confusion of the Issues

The testimony of the State's witnesses about the aggravated sexual assault and threatened aggravated sexual assault lasted two days. The State called fifteen witnesses, and only two of them testified about Appellant's flight from the apartment complex and the fire in that apartment complex. Appellant argues that the State devoted time and effort in developing evidence of the

extraneous offense. However, the record reflects that the State's presentation of the extraneous offense evidence consumed very little time in comparison to the length of the State's case-in-chief.

Additionally, the trial court reasonably could have concluded that the extraneous offense evidence assisted the jury in understanding Appellant's state of mind (consciousness of guilt) at the time of the extraneous offense. Accordingly, the trial court could have reasonably concluded that the extraneous offense evidence did not have a tendency to confuse or distract the jury from the main issues in the case.

### 4. Misleading the Jury

The State's evidence regarding the aggravated sexual assault and threatened aggravated sexual assault was much more detailed than the extraneous offense evidence. The main thrust of the State's case was the charged offenses. Although the State presented evidence of the extraneous offense, it did not suggest that the evidence could be used to convict Appellant for the offense of arson. The extraneous offense evidence was presented in a fashion to prove Appellant's consciousness of guilt of the aggravated sexual assault and threatened aggravated sexual assault. Accordingly, the trial court could have reasonably concluded that the extraneous offense evidence did not have a tendency to be given undue weight by a jury that was not equipped to evaluate the probative force of the evidence.

### 5. Undue Delay and Needless Presentation of Cumulative Evidence

As stated above, although the testimony of the State's witnesses lasted two days, the time spent by the prosecutor presenting evidence, the trial court instructing the jury, and the defense cross-examining the witnesses concerning the extraneous offense was not significant in comparison. As such, the trial court could have reasonably concluded that the presentation of the

extraneous offense evidence would not consume an inordinate amount of time. Additionally, the trial court could have determined that the extraneous offense evidence was not cumulative of other evidence presented at trial.

After balancing the Rule 403 factors, we conclude that the trial court could have reasonably determined that the probative value of the extraneous offense evidence was not substantially outweighed by the countervailing factors specified in the rule. *See* TEX.R.EVID. 403. We cannot say that the trial court's ruling was outside the "zone of reasonable disagreement." *Stewart*, 129 S.W.3d at 96. As a result, we hold that the trial court did not abuse its discretion by admitting the extraneous offense evidence. *See* TEX.R.EVID. 403, 404.

*Harm Analysis*

Had we concluded that the trial court erred by admitting the evidence of extraneous conduct, we would then be obligated to determine whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Whitaker v. State,* 286 S.W.3d 355, 363 (Tex. Crim. App. 2009), *quoting King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997); *see* TEX.R.APP.P. 44.2(b). If the error had no influence or only a slight influence on the verdict, it is harmless. *Whitaker*, 286 S.W.3d at 363. The error is harmful when the reviewing court has "grave doubts" that the error did not affect the outcome of the trial. *Williams v. State,* 145 S.W.3d 737, 741 (Tex.App.--Fort Worth 2004, no pet.). A grave doubt is one in which "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Williams*, 145 S.W.3d at 741, *quoting Russell v. State*, 113 S.W.3d 530, 550 (Tex.App.--Fort Worth 2003, pet ref'd.). This Court must calculate, to the extent possible, the probable impact of the error on the jury in light of the existence of other evidence. *Westbrook v. State,* 29 S.W.3d 103, 119 (Tex.Crim.App. 2000). The presence of

14

overwhelming evidence may be a factor in the evaluation of harmless error. *Id.; Motilla v. State,* 78 S.W.3d 352, 357 (Tex.Crim.App. 2002)("our conclusion . . . that overwhelming evidence of guilt is a factor to be considered . . . applies to harm analysis conducted under the current rules.").

In reviewing the entirety of this case, we find nothing in the record which suggests that the admission of evidence of extraneous conduct had a substantial and injurious effect or influence on the jury's verdict. We have no grave doubts that the error, if any, affected the outcome of the trial. The evidence presented against Appellant was substantial, compelling, and indeed, overwhelming.

N.S. identified Appellant as the person who threatened, assaulted, and then sexually assaulted her with at least one deadly weapon. A physical examination of N.S. revealed injuries consistent with the beating she received, and a sexual assault examination revealed injuries to her sexual organ consistent with non-consensual sexual intercourse. N.S. reported to the emergency medical technicians and the nurse at the hospital that Appellant threatened to kill her, struck her about the head and body with his fists and sexually assaulted her. N.S. and her mother both knew Appellant very well and had permitted him to live in their residence temporarily. DNA tests were unable to exclude Appellant as the person who sexually assaulted N.S. Appellant implicitly confessed to the aggravated sexual assault when, confronted by the victim's mother, he stated "the bitch deserved it." He fled from the scene of the sexual assault and fled from the apartment where he was hiding later that day – evidencing his consciousness of guilt of the charged offenses. In light of the foregoing, any error in the admission of the evidence of extraneous conduct, and we have found none, was harmless. Appellant's second issue is overruled.

*Conclusion*

Having overruled both of Appellant's issues, the judgment of the trial court is affirmed.


January 11, 2012

CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)