COURT OF APPEALS

EIGHTH DISTRICT OF
TEXAS

EL PASO, TEXAS

 

 


 
 
 JEREMY DONTAE CRAFT,
 
 
 §
 
 
  
 
 
 
 
  
 
 
  
 
 
 No. 08-10-00107-CR
 
 
 
 
 Appellant,
 
 
 §
 
 
  
 
 
 
 
  
 
 
  
 
 
 Appeal from the
 
 
 
 
 v. 
 
 
 §
 
 
  
 
 
 
 
  
 
 
  
 
 
 Criminal
 District Court Number Three
 
 
 
 
  
 
 
 §
 
 
  
 
 
 
 
 THE STATE OF TEXAS,
 
 
  
 
 
 of Tarrant
 County, Texas
 
 
 
 
  
 
 
 §
 
 
  
 
 
 
 
 Appellee.
 
 
  
 
 
 (TC# 1121299D)
 
 
 
 
  
 
 
 §
 
 
  
 
 


 

 

O
P I N I O N

Appellant
Jeremy Dontae Craft was indicted for the offenses of aggravated sexual assault
and threatened aggravated sexual assault.[1]
 The indictment also included a deadly
weapon finding notice.  Appellant entered
a plea of not guilty to the charged offenses and a plea of not true to the
deadly weapon finding notice, and proceeded to a trial on the merits.  The jury found Appellant guilty of the
charged offenses and made a finding of true relative to the use of a deadly
weapon.  At the conclusion of the
punishment phase of the trial, the jury assessed punishment at ninety-nine (99)
years confinement in the Institutional Division of the Texas Department of Criminal
Justice.  Appellant raises two issues in
this Court.  First, that the trial court
erred in denying his Batson challenge;[2]
and second, that the trial court erred by admitting evidence of extraneous
conduct in violation of the Texas Rules of Evidence.

Background

            On
May 29, 2008, N.S. was living with her mother on 5554 Norris Street in Fort
Worth.  Appellant had just moved into the
house on a temporary basis at the request of N.S.’s mother.  N.S. and Appellant had known each other from
the time that they were very young.

Early that morning,
N.S. drove her mother to work.  When she
returned to the house, N.S. saw Appellant pacing the entrance hall with a
baseball bat in his hand.  She put down her
cell phone and car keys and walked into her bedroom to get dressed.  N.S. heard Appellant call her name.  When she turned around, she saw Appellant standing
in her room with a baseball bat in one hand and a long, wide knife with a thick
handle in the other.  Appellant ordered
her to take off her clothes and get on the bed. 
She initially thought it was some type of joke and told Appellant she
would not take off her clothes.

Appellant moved closer to her and repeated his demand that
she remove her clothes.  When she still
did not comply, Appellant grabbed N.S. by the hand and took her into the next
bedroom.  Appellant repeatedly instructed
her to remove her clothes and threatened to “knock [her] out.”  Appellant threw her on the bed.  He then dropped the knife and the bat and
began to use his fists to punch her in the face, doing so five or six times.  Blood started coming out of a wound above her
right eye as Appellant continued to hit her on the whole right side of her body.
 Using both of his hands, Appellant
removed her clothes, told her he was going to kill her, and kill himself.  He then removed his own clothes and forced his
penis into her.

When Appellant finally stopped sexually assaulting N.S., he
allowed her to put her clothes back on.  He also put a Band-Aid on the cut above her
eye.  Appellant informed N.S. that if she
told anyone about the sexual assault, he would kill her.  She told him that she would not tell anyone.  He permitted her to leave the house, and told
her that he was going to wait for the police.

N.S. fled to Appellant’s aunt’s house which was nearby and
told her what happened.  Appellant’s aunt
called the police.  An Emergency Medical Technician,
Richard Hoover, testified that his ambulance was dispatched to 2301 Riverside Drive
at around 8:15 a.m. on May 29, 2008.  Upon his arrival, Mr. Hoover found N.S.
sitting in a car and crying.  She told
him that she had been raped and complained about pain.  She repeated that she had been punched and
sexually assaulted.

            A
physical exam of N.S. revealed injuries which were consistent with having been
punched in the face and about the body with a fist.  A sexual assault exam revealed injuries which
were consistent with non-consensual sexual intercourse.

As noted above, the
jury found Appellant guilty of aggravated sexual assault and threatened
aggravated sexual assault and made a finding of true relative to the use of a
deadly weapon.  The jury assessed
punishment at ninety-nine (99) years confinement in the Institutional Division
of the Texas Department of Criminal Justice.

In his first issue on
appeal, Appellant argues that the trial court erred in denying his Batson challenge.

Standard of Review

            A
defendant objecting under Batson must
make a prima facie showing of racial discrimination in the State’s exercise of
its peremptory strikes.  Williams v. State, 301 S.W.3d 675, 688
(Tex.Crim.App. 2009), cert. denied,
--- U.S. ----, 130 S.Ct. 3411, 177 L.Ed.2d 326 (2010).  The burden then shifts to the State to
articulate race-neutral explanations for its strikes. Williams, 301 S.W.3d at 688.  Once the prosecutor has articulated
race-neutral explanations, the burden shifts back to the defendant to show that
the explanations are really a pretext for discrimination.  Id.  The trial court must then determine whether
the defendant has carried his burden of proving discrimination.  Id.  The trial court’s determination is accorded
great deference and will not be overturned on appeal unless it is clearly
erroneous.  Id.; Watkins v. State,
245 S.W.3d 444, 448 (Tex.Crim.App.), cert.
denied, 555 U.S. 846, 129 S.Ct. 92, 172 L.Ed.2d 78 (2008).

Appellate
courts must give great deference to credibility and demeanor determinations
made by the trial court in connection with a Batson inquiry, and the Court of Criminal Appeals has explained our
review of a Batson ruling as follows:

 

In assaying the record for clear
error, vel non, the reviewing court
should consider the entire record of voir
dire; it need not limit itself to arguments or considerations that the
parties specifically called to the trial court’s attention so long as those
arguments or considerations are manifestly grounded in the appellate record.  But a reviewing court should examine a trial
court’s conclusion that a facially race-neutral explanation for a peremptory
challenge is genuine, rather than a pretext, with great deference, reversing
only when that conclusion is, in view of the record as a whole, clearly
erroneous.

 

Watkins, 245 S.W.3d at 448 [Citations omitted].  Factors that the United States Supreme Court
has considered to determine whether peremptory challenges were used on a
racially discriminatory basis include:  (1) whether the State struck a higher
percentage of African-Americans than non-African-Americans; (2) whether the
State’s reasons for striking African-Americans appeared to apply equally to
non-African-Americans whom the State did not strike; (3) whether the State used
jury shuffles in a manner that supported an inference of racial discrimination;
(4) whether the State questioned African-Americans and non-African-Americans
differently and in a way designed to obtain answers justifying strikes of
African-Americans; and (5) whether the county in which the defendant was
prosecuted had a formal policy of excluding minority jurors from service.  See
Miller-El v. Dretke, 545 U.S. 231, 240-64, 125 S.Ct. 2317, 2325-39, 162
L.Ed.2d 196 (2005).

Application

            Preliminarily,
the record is unclear as to the racial make-up of the panel as a whole.  Further, there is no indication as to the
race of veniremembers # 3 and # 8.[3]  On the other hand, the record does reflect
that three African-Americans were disqualified by agreement of the
parties.  One African-American claimed an
exemption.  Two African-Americans were
successfully challenged for cause by the State without objection from the
defense.  Two African-Americans were
peremptorily challenged by the State, and one African-American was peremptorily
challenged by Appellant.  Finally, an
African-American individual was selected as the alternate juror.

At the
conclusion of voir dire, Appellant’s counsel raised a Batson objection challenging the State’s
peremptory strike of veniremembers # 3 and # 8, arguing that there was no
race-neutral reason why those veniremembers were struck.

In Response,
the State argued that venireperson # 3 “expressed a general hesitation to
believing the victim and returning a verdict of guilty” in the absence of scientific
evidence, and that venireperson # 8 initially stated that while he understood
the law requires only proof beyond a reasonable doubt, he would require 100
percent proof from the State before he could return a verdict of guilty.  The State also noted that during the defense voir dire, venireperson # 8 gave
equivocating answers to the questions posed to him, and changed his mind with
ease based on the answers provided by another venireperson.

Because the
State offered race-neutral reasons for the exercise of its peremptory strikes,
the burden shifted back to Appellant to establish that the State’s explanations
were a pretext for discrimination.

At trial,
Appellant did not contest the explanation offered by the State as to
venireperson # 3.  As to the explanation
offered by the State with respect to venireperson # 8, Appellant argued that
the venireperson had sufficiently rehabilitated himself during the defense voir dire such that he could not be
challenged for cause, and as a result, there was no race-neutral reason to
strike him.

The trial court
found that venireperson # 3 indicated that she was unable to make a decision
based on witness testimony alone, and that she would require proof of
scientific evidence based on her scientific background.  With respect to venireperson # 8, the court
found that his answers “kind of went back and forth several times.”  The court determined that venireperson # 8
was “absolutely positive . . . that the State would have to bring him proof
beyond a reasonable doubt, a hundred percent.” 
In both cases, the trial court necessarily determined that the
race-neutral reasons offered by the State for the exercise of its peremptory
challenges were not pre-textual.  We
agree.

            The
total venire consisted of seventy persons. 
Following voir dire, the final
panel consisted of thirty-eight venirepersons, including four
African-Americans.  Of the four remaining
African-American venirepersons, the State struck two and the defense struck
one.  The final African-American
venireperson was selected as the alternate juror.

            In
considering the Miller-El factors, the
State did not strike a higher percentage of African-Americans than non-African-Americans.  Both sides had ten peremptory strikes
available to them.  Of those, the State
exercised two (20 percent) against African-American venirepersons, and seven (70
percent) against non-African-American venirepersons.[4]  The defense exercised one (10 percent) of its
ten peremptory strikes against an African-American venireperson.

            Our
review of the entire voir dire record
reveals no disparate treatment by the State between African-American
venirepersons and non-African-American venirepersons.  The prosecutor’s inquiries of the panel as a
whole were not discriminatory, nor were different questions posed to
African-American members of the panel than to non-African-American members.  There is nothing in the record identifying
any other African-American venireperson who could have been challenged by the
State, but was not, on the basis of the State’s proffered reasons for
challenging venirepersons # 3 and # 8.

            The
record is devoid of evidence that the State utilized a jury shuffle in a manner
that supports an inference of racial discrimination, and there is no evidence
that the county in which Appellant was tried has a policy to exclude minorities
or a history of purposefully excluding minorities from jury service.

Under the circumstances in
this case, we cannot conclude that Appellant made a prima facie showing of racial discrimination.  Nevertheless, assuming Appellant made his prima facie showing, we cannot say,
based on this record, that the trial court’s decision to deny his Batson
challenge was clearly erroneous.  Appellant’s first issue is overruled.

 

 

Extraneous
Evidence

            Next, Appellant argues that the trial court erred when it
admitted evidence of extraneous conduct in violation of the Texas Rules of
Evidence.  Specifically, Appellant argues
that the trial court admitted extensive evidence of an arson offense that
implicated Appellant, but which failed to prove Appellant had committed the
arson offense.  Rather, the evidence
established only that Appellant was in the area of the fire.

            The challenged extraneous conduct evidence is that N.S.’s
mother, Pamela Wall, testified that after leaving the hospital where her
daughter was being examined, she saw Appellant walking down Berry Street and
attempted to confront him.  Appellant
fled to a nearby apartment complex while Ms. Wall chased him yelling “he just
raped my baby.”  Ms. Wall repeatedly
banged on the door of the apartment in which Appellant was hiding and demanded
that he come out.  At some point, she
left and hid behind the apartment building to wait for Appellant to exit the
apartment.  When he did, Ms. Wall
confronted Appellant and asked why he had raped her daughter.  Appellant responded “the bitch deserved it,”
and ran away.

            Later that afternoon, Officer Phillips and his partner
received a report that Appellant had been spotted in an apartment complex at
2201 E. Berry.  When they arrived at the
apartment complex, the officers were informed that there was a fire in one of
the apartments.  Other police officers
informed Officer Phillips that Appellant had been seen “running from the location
of the fire.”  Officer Phillips and his
partner were unable to locate Appellant at that time.

            An investigator with the Arson and Bomb Division of the Fort
Worth Fire Department testified that a mattress and bedding in the bedroom of a
residence in the apartment complex had been intentionally set on fire.

            The State argued that the testimony related above was
admissible as evidence of consciousness of guilt given Appellant’s actions in
attempting to evade capture by the police.

            The defense countered that the testimony was not relevant
because it established only that Appellant was seen in an area in close
proximity to an apartment complex where a fire had been intentionally set.  Appellant further argues that because the
arson investigator had no knowledge of who set the fire, any evidence that
Appellant was possibly an arsonist fails to make a fact of consequence more or
less probable thereby rendering such evidence irrelevant.

Standard
of Review

            When reviewing a trial court’s decision to admit
extraneous offense evidence under Rule 404(b), or over a Rule 403 objection, an
appellate court applies an abuse-of-discretion standard.  See De
La Paz v. State, 279 S.W.3d 336, 343 (Tex.Crim.App. 2009).  A trial court abuses its discretion only when
its decision lies outside “the ‘zone of reasonable disagreement.’”  Id.
at 343-44.  The general rule is that the
defendant is to be tried only for the offense charged, not for any other crimes
or for being a criminal generally.  Segundo v. State, 270 S.W.3d 79, 87
(Tex.Crim.App. 2008); Crank v. State,
761 S.W.2d 328, 341 (Tex.Crim.App. 1988).  Evidence of extraneous acts of misconduct may
be admissible if (1) the uncharged act is relevant to a material issue in the
case, and (2) the probative value of that evidence is not significantly
outweighed by its prejudicial effect.  Segundo, 270 S.W.3d at 87.

Relevant evidence is any
evidence “having any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable
than it would be without the evidence.”  Tex.R.Evid. 401; Rankin v. State, 974 S.W.2d 707, 709 (Tex.Crim.App. 1996).

“Evidence of other crimes,
wrongs or acts” may not be admitted during the guilt-innocence phase of trial “to
prove the character of a person in order to show action in conformity
therewith.”  Tex.R.Evid. 404(b); Marc
v. State, 166 S.W.3d 767, 775 (Tex.App.--Fort Worth 2005, pet. ref’d).  Such evidence of extraneous offenses may be
admitted to prove motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident. Tex.R.Evid.
404(b).  The Court of Criminal Appeals
has explained, “‘Rule 404(b) is a rule of inclusion rather than exclusion.’  The rule excludes only that evidence that is
offered (or will be used) solely for the purpose of proving bad character and
hence conduct in conformity with that bad character.”  De La
Paz, 279 S.W.3d at 343 [Footnotes omitted].  The State, as the proponent of extraneous
offense evidence, bears the burden of showing admissibility.  Russell
v. State, 113 S.W.3d 530, 535 (Tex.App.--Fort Worth 2003, pet. ref’d); Rankin v. State, 974 S.W.2d 707, 718
(Tex.Crim.App. 1996)(op. on reh’g).

Application

Appellant argues that the
State’s attempt to portray him as an arsonist fails to make a fact of
consequence more or less probable relative to the trial on the charged offenses
of aggravated sexual assault and threatened aggravated sexual assault, and that
the only purpose of the extraneous conduct evidence was to establish that
Appellant must be guilty of the charged offenses if he was willing to commit
another offense.  We disagree.

The fact of consequence to
which Appellant’s flight was relevant was his knowledge or consciousness of
guilt of the charged offenses, rather than the possible arson.  Evidence of flight may establish a defendant’s
guilt because, unlike other extraneous offenses, it “shows a consciousness of
guilt of the crime for which the defendant is on trial.”  Bigby v.
State, 892 S.W.2d 864, 884 (Tex.Crim.App. 1994), overruled on other grounds by Tennard
v. Dretke, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).  The fact that other extraneous offenses are
committed while in flight does not render such evidence inadmissible, and so
long as the extraneous offense is shown to be related to the circumstances of
the defendant’s flight, they may be admitted. 
Foster v. State, 779 S.W.2d 845,
859 (Tex.Crim.App. 1989)(evidence that a defendant shot a victim, stole his
car, and later took other hostages in an effort to flee from police admissible
as part of evidence of flight); Bigby,
892 S.W.2d at 883 (evidence that defendant stole a pistol and threatened judge
before being physically subdued by judge, assistant district attorney, and
bailiff admissible as evidence of flight); Arivette
v. State, 513 S.W.2d 857, 862 (Tex.Crim.App. 1974)(evidence that defendant
kidnapped several individuals, shot a hostage, and killed a deputy admissible
as evidence of flight).

Here, Appellant was seen
fleeing from the apartment complex in which the fire was started.  His flight and apparent efforts to ensure its
success were clearly relevant to establish knowledge – consciousness of guilt.

Next, although relevant,
evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice, confusion of the issues, or misleading the
jury, or by considerations of undue delay, or needless presentation of cumulative
evidence.  Tex.R.Evid. 403.

Once a Rule 403 objection is
made, the trial court must weigh the probative value of the evidence to
determine if it is substantially outweighed by its potential for unfair
prejudice. Santellan v. State, 939
S.W.2d 155, 169 (Tex.Crim.App. 1997).  A Rule
403 balancing test includes the following factors:  (1) the inherent probative force of the
proffered item of evidence along with (2) the proponent’s need for that
evidence against (3) any tendency of the evidence to suggest decision on an
improper basis, (4) any tendency of the evidence to confuse or distract the
jury from the main issues, (5) any tendency of the evidence to be given undue
weight by a jury that has not been equipped to evaluate the probative force of
the evidence, and (6) the likelihood that presentation of the evidence will
consume an inordinate amount of time or merely repeat evidence already
admitted.  Gigliobianco v. State, 210 S.W.3d 637, 641-42 & n.8
(Tex.Crim.App. 2006).

1.  Probative Value and Need

The trial court could have
concluded that the extraneous offense evidence was highly probative to show Appellant’s
knowledge and consciousness of guilt.  He
fled the scene of the rape and when confronted by the victim’s mother at the
apartment complex, stated “the bitch deserved it.”  He fled the confrontation with the victim’s
mother, and later, as the police approached, fled the apartment complex where a
fire had been started.  It was certainly
a reasonable inference from the evidence presented that Appellant started the
fire to aid his flight from the apartment complex.  This evidence was of value in establishing
Appellant’s consciousness of guilt.

2.  Unfair Prejudice

The trial court could have
reasonably determined that the extraneous offense evidence did not have a
tendency to suggest a decision on an improper basis.  Although the extraneous evidence had the
potential to evoke an emotional response in the jury, it is clear from the
record that the State introduced the evidence to establish Appellant’s consciousness
of guilt of the charged offenses, and not to paint him as an arsonist.  Additionally, the trial court instructed the
jury that it could only consider the extraneous offense evidence “in
determining the motive, intent, preparation, plan, knowledge, absence of
mistake or accident, for this defendant now on trial before you, or rebuttal of
a defensive theory and for no other purpose.”

3.  Confusion of the Issues

The testimony of the State’s
witnesses about the aggravated sexual assault and threatened aggravated sexual
assault lasted two days.  The State
called fifteen witnesses, and only two of them testified about Appellant’s
flight from the apartment complex and the fire in that apartment complex.  Appellant argues that the State devoted time
and effort in developing evidence of the extraneous offense.  However, the record reflects that the State’s
presentation of the extraneous offense evidence consumed very little time in
comparison to the length of the State’s case-in-chief.

Additionally, the trial court
reasonably could have concluded that the extraneous offense evidence assisted
the jury in understanding Appellant’s state of mind (consciousness of guilt) at
the time of the extraneous offense.  Accordingly,
the trial court could have reasonably concluded that the extraneous offense
evidence did not have a tendency to confuse or distract the jury from the main
issues in the case.

4.  Misleading the Jury

The State’s evidence
regarding the aggravated sexual assault and threatened aggravated sexual
assault was much more detailed than the extraneous offense evidence.  The main thrust of the State’s case was the
charged offenses.  Although the State
presented evidence of the extraneous offense, it did not suggest that the
evidence could be used to convict Appellant for the offense of arson.  The extraneous offense evidence was presented
in a fashion to prove Appellant’s consciousness of guilt of the aggravated
sexual assault and threatened aggravated sexual assault.  Accordingly, the trial court could have
reasonably concluded that the extraneous offense evidence did not have a
tendency to be given undue weight by a jury that was not equipped to evaluate
the probative force of the evidence.

5.  Undue Delay and Needless Presentation of
Cumulative Evidence

As stated above, although the
testimony of the State’s witnesses lasted two days, the time spent by the
prosecutor presenting evidence, the trial court instructing the jury, and the
defense cross-examining the witnesses concerning the extraneous offense was not
significant in comparison.  As such, the
trial court could have reasonably concluded that the presentation of the
extraneous offense evidence would not consume an inordinate amount of time.  Additionally, the trial court could have
determined that the extraneous offense evidence was not cumulative of other
evidence presented at trial.

After balancing the Rule 403
factors, we conclude that the trial court could have reasonably determined that
the probative value of the extraneous offense evidence was not substantially
outweighed by the countervailing factors specified in the rule.  See Tex.R.Evid. 403.  We cannot say that the trial court’s ruling
was outside the “zone of reasonable disagreement.”  Stewart,
129 S.W.3d at 96.  As a result, we hold
that the trial court did not abuse its discretion by admitting the extraneous
offense evidence.  See Tex.R.Evid. 403,
404.

Harm
Analysis

Had we concluded that the
trial court erred by admitting the evidence of extraneous conduct, we would then
be obligated to determine whether the error had “a substantial and injurious
effect or influence in determining the jury’s verdict.”  Whitaker
v. State, 286 S.W.3d 355, 363 (Tex. Crim. App. 2009), quoting King v. State, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997); see Tex.R.App.P.
44.2(b).  If the error had no influence
or only a slight influence on the verdict, it is harmless.  Whitaker,
286 S.W.3d at 363.  The error is harmful
when the reviewing court has “grave doubts” that the error did not affect the
outcome of the trial.  Williams v. State, 145 S.W.3d 737, 741
(Tex.App.--Fort Worth 2004, no pet.).  A
grave doubt is one in which “in the judge’s mind, the matter is so evenly
balanced that he feels himself in virtual equipoise as to the harmlessness of
the error.”  Williams, 145 S.W.3d at
741, quoting Russell v. State, 113 S.W.3d 530, 550 (Tex.App.--Fort Worth 2003,
pet ref’d.).  This Court must calculate,
to the extent possible, the probable impact of the error on the jury in light
of the existence of other evidence.  Westbrook v. State, 29 S.W.3d 103, 119
(Tex.Crim.App. 2000).  The presence of
overwhelming evidence may be a factor in the evaluation of harmless error.  Id.;
Motilla v. State, 78 S.W.3d 352, 357
(Tex.Crim.App. 2002)(“our conclusion . . . that overwhelming evidence of guilt
is a factor to be considered . . . applies to harm analysis conducted under the
current rules.”).

In reviewing the entirety of
this case, we find nothing in the record which suggests that the admission of
evidence of extraneous conduct had a substantial and injurious effect or
influence on the jury’s verdict.  We have
no grave doubts that the error, if any, affected the outcome of the trial.  The evidence presented against Appellant was
substantial, compelling, and indeed, overwhelming.

N.S. identified Appellant as
the person who threatened, assaulted, and then sexually assaulted her with at
least one deadly weapon.  A physical
examination of N.S. revealed injuries consistent with the beating she received,
and a sexual assault examination revealed injuries to her sexual organ
consistent with non-consensual sexual intercourse.  N.S. reported to the emergency medical
technicians and the nurse at the hospital that Appellant threatened to kill
her, struck her about the head and body with his fists and sexually assaulted
her.  N.S. and her mother both knew
Appellant very well and had permitted him to live in their residence
temporarily.  DNA tests were unable to
exclude Appellant as the person who sexually assaulted N.S.  Appellant implicitly confessed to the
aggravated sexual assault when, confronted by the victim’s mother, he stated “the
bitch deserved it.”  He fled from the
scene of the sexual assault and fled from the apartment where he was hiding
later that day – evidencing his consciousness of guilt of the charged
offenses.  In light of the foregoing, any
error in the admission of the evidence of extraneous conduct, and we have found
none, was harmless.  Appellant’s second issue
is overruled.

Conclusion

Having overruled both of Appellant’s issues, the judgment of the trial
court is affirmed.

 

 

January 11, 2012

                                                                                    CHRISTOPHER
ANTCLIFF, Justice

 

Before McClure, C.J., Rivera,
and Antcliff, JJ.

 

(Do Not Publish)











[1]
This case was transferred from the Second Court of Appeals to this Court
pursuant to a docket equalization order entered by the Texas Supreme
Court.  See Tex.Gov’t Code Ann.
§ 73.001 (West 2005).  We have applied
precedent of the Fort Worth Court of Appeals. 
See Tex.R.App.P. 41.3.





[2]
See Batson v. Kentucky, 476 U.S. 79,
106 S.Ct. 1712, 90 L.Ed.2d (1986).





[3]
Although, given the nature of Appellant’s Batson
challenge, the fact that Appellant is African-American, and considering the
discussion between defense counsel, the prosecutor, and the trial court
regarding the Batson challenge, it is
safe to assume that veniremembers # 3 and # 8 are African-American. 





[4]
The State used only nine of its ten available peremptory strikes.